**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KATIE JOHN; CHARLES ERHART;
ALASKA INTER-TRIBAL
COUNCIL; NATIVE VILLAGE OF
TANANA; STATE OF ALASKA,
*Plaintiffs*,

and

ALASKA FISH AND WILDLIFE
CONSERVATION FUND; ALASKA
FISH AND WILDLIFE FEDERATION
AND OUTDOOR COUNCIL; JOHN
CONRAD; MICHAEL TINKER,
*Plaintiffs-Intervenors-*
*Appellants*,

v.

UNITED STATES OF AMERICA;
MIKE JOHANNS; SALLY JEWELL,[*]
Secretary of the Interior,
*Defendants-Appellees*,

ALASKA FEDERATION OF
NATIVES,
*Defendant-Intervenor-Appellee.*

No. 09-36122

D.C. Nos.
3:05-cv-00006-HRH
3:05-cv-00158-HRH

---

[*] Sally Jewell is substituted for her predecessor, Kenneth Lee Salazar, as Secretary of the Interior. Fed. R. App. P. 43(c)(2).

KATIE JOHN; CHARLES ERHART;
ALASKA INTER-TRIBAL
COUNCIL; NATIVE VILLAGE OF
TANANA,
                    *Plaintiffs*,

ALASKA FISH AND WILDLIFE
CONSERVATION FUND; ALASKA
FISH AND WILDLIFE FEDERATION
AND OUTDOOR COUNCIL; JOHN
CONRAD; MICHAEL TINKER,
          *Plaintiffs-Intervenors*,

          and

STATE OF ALASKA,
             *Plaintiff-Appellant*,

          v.

UNITED STATES OF AMERICA;
MIKE JOHANNS; SALLY JEWELL,
Secretary of the Interior,
             *Defendants-Appellees*,

ALASKA FEDERATION OF
NATIVES,
    *Defendant-Intervenor-Appellee*.

No. 09-36125

D.C. Nos.
3:05-cv-00006-HRH
3:05-cv-00158-HRH

KATIE JOHN; CHARLES ERHART;
ALASKA INTER-TRIBAL
COUNCIL; NATIVE VILLAGE OF
TANANA,
                    *Plaintiffs-Appellants*,

                  and

STATE OF ALASKA,
                            *Plaintiff*,

ALASKA FISH AND WILDLIFE
CONSERVATION FUND; ALASKA
FISH AND WILDLIFE FEDERATION
AND OUTDOOR COUNCIL; JOHN
CONRAD; MICHAEL TINKER,
                *Plaintiffs-Intervenors*,

                   v.

UNITED STATES OF AMERICA;
MIKE JOHANNS; SALLY JEWELL,
Secretary of the Interior,
                *Defendants-Appellees*,

ALASKA FEDERATION OF
NATIVES,
                *Defendant-Intervenor-*
                            *Appellee.*

No. 09-36127

D.C. Nos.
3:05-cv-00006-HRH
3:05-cv-00158-HRH


OPINION

Appeal from the United States District Court
for the District of Alaska
H. Russel Holland, Senior District Judge, Presiding

Argued and Submitted
July 25, 2011—Anchorage, Alaska

Filed July 5, 2013

Before: William C. Canby, Jr., Andrew J. Kleinfeld,
and Consuelo M. Callahan, Circuit Judges.**

Opinion by Judge Kleinfeld

## SUMMARY***

**Alaska National Interest Lands Conservation Act**

The panel affirmed the district court's decisions upholding the 1999 Final Rules promulgated by the Secretary of the Interior and the Secretary of Agriculture to implement part of the Alaska National Interest Lands Conservation Act concerning subsistence fishing and hunting rights.

---

** Judge Betty B. Fletcher was a member of the panel but passed away after oral argument. Judge Canby was drawn to replace her. He has read the briefs, reviewed the record, and listened to the tape of oral argument held on July 25, 2011.

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

In *Alaska v. Babbitt*, 72 F.3d 698 (9th Cir. 1995) ("*Katie John I*"), the court held that, because Congress included subsistence fishing in Title VIII, the Act applied to *some* of Alaska's navigable waters. The 1999 Rules identified which navigable waters within Alaska constituted "public lands" under Title VIII of the Act, which provides a priority to rural Alaska residents for subsistence hunting and fishing on such lands.

As threshold issues, the panel held that the Secretaries appropriately used notice-and-comment rulemaking, rather than adjudication, to identify whose waters are "public lands" for the purpose of determining the scope of the Act's rural subsistence policy; and that in construing the term "public lands," the Secretaries were entitled to "some deference." The panel concluded that, in the 1999 Rules, the Secretaries applied *Katie John I* and the federal reserved water rights doctrine in a principled manner. The panel held that it was reasonable for the Secretaries to decide that: the "public lands" subject to the Act's rural subsistence priority included the waters within and adjacent to federal reservations; and reserved water rights for Alaska Native Settlement allotments were best determined on a case-by-case basis.

**COUNSEL**

Michael G. Mitchell (argued), Michael W. Sewright, Assistant Attorneys General, Anchorage, Alaska; William P. Horn and James H. Lister, Birch, Horton, Bittner, and Cherot, Washington, D.C., for Appellant State of Alaska.

Will Sherman for Appellants Alaska Fish and Wildlife Federation and Outdoor Council, Alaska Fish & Wildlife Conservation Fund, Michael Tinker, and John Conrad.

Heather Kendall-Miller (argued), Native American Rights Fund, Anchorage, Alaska, for Appellants Katie John, Charles Erhart, Alaska Inter-Tribal Council, and Native Village of Tanana.

Elizabeth Ann Peterson (argued), United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C., for Appellees United States of America, Mike Johanns and Sally Jewell.

Robert T. Anderson (argued), University of Washington School of Law, Seattle, Washington, for Appellee Alaska Federation of Natives.

Peter J. Ampe, First Assistant Attorney General, Federal and Interstate Water Unit, Denver, Colorado, for Amicus Curiae State of Colorado; Stephen R. Farris, Assistant Attorney General, Director, Water, Environment, and Utilities Division, Santa Fe, New Mexico, for Amicus Curiae State of New Mexico; Peter K. Michael, Senior Assistant Attorney General, Cheyenne, Wyoming, for Amicus Curiae State of Wyoming.

# OPINION

KLEINFELD, Senior Circuit Judge:

These consolidated appeals concern the 1999 Final Rules ("1999 Rules") promulgated by the Secretary of the Interior and the Secretary of Agriculture ("Secretaries") to implement part of the Alaska National Interest Lands Conservation Act ("ANILCA").[1] The 1999 Rules identify which navigable waters within Alaska constitute "public lands" under Title VIII of ANILCA, which provides a priority to rural Alaska residents for subsistence hunting and fishing on such lands. Plaintiffs-Appellants Katie John, et al., argue that the 1999 Rules sweep too narrowly, in that they fail to designate certain navigable waterways as "public lands" subject to the federal rural subsistence priority. Plaintiff-Appellant the State of Alaska argues that the 1999 Rules sweep too broadly, in that they include as "public lands" subject to the priority waters in which no federal interest exists. The district court upheld the 1999 Rules against both sets of challenges. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

# BACKGROUND

## A.  Legal and factual background

### 1.  ANILCA and the rural subsistence priority

Congress enacted ANILCA to preserve and protect "nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and

---

[1] 16 U.S.C. §§ 3101-3233, Pub. L. 96-487, 94 Stat. 2371 (1980).

wildlife values" and landscapes by creating "conservation system units," such as national parks, preserves, and other federal reservations.[2]   Congress also sought to protect the "subsistence way of life for rural residents" and the resources upon which they depend, as well as to obviate the need for future legislation regarding environmental conservation and subsistence uses.[3]

To protect the "subsistence way of life for rural residents," Title VIII of ANILCA provides that, "[e]xcept as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes."[4] "Subsistence uses" are defined as "customary and traditional uses by *rural* Alaska residents of wild, renewable resources . . . ."[5] This federal subsistence priority for rural Alaska residents therefore applies to all "public lands," which ANILCA defines as "land situated in Alaska which, after December 2, 1980, are Federal lands," except, as pertinent here, "land selections of the State of Alaska which have been tentatively approved or validly selected under the Alaska Statehood Act and lands which have been confirmed to, validly selected by, or granted to the Territory of Alaska or the State under any other provision of Federal law," and "land selections of a Native Corporation made under the Alaska

---

[2] 16 U.S.C. § 3101(a)–(b); *see also id.* § 3102(4) (defining "conservation system units").

[3] *Id.* § 3101(c)–(d).

[4] *Id.* § 3114.

[5] *Id.* § 3113 (emphasis added).

Native Claims Settlement Act which have not been conveyed to a Native Corporation, unless any such selection is determined to be invalid or is relinquished."[6]  Federal lands are "lands the title to which is in the United States after December 2, 1980," and "land" is "lands, waters, and interests therein."[7]  ANILCA gives rural subsistence uses "priority over the taking on such lands of fish and wildlife for other purposes."[8]  When it is "necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses," implementation of such restrictions is subject to a set of criteria.[9]

ANILCA charges the Secretaries with implementing its rural subsistence priority in Alaska.[10]  However, ANILCA states that the Secretaries should not take action to implement Title VIII if Alaska "enacts and implements laws of general applicability which are consistent with" ANILCA's rural subsistence priority requirements.[11]  In other words, ANILCA expresses a preference for state management of the rural

---

[6] *Id.* § 3102(3).

[7] *Id*. § 3102(1)–(2).

[8] *Id.* § 3114.

[9] *Id*.

[10] *Id*. § 3115.

[11] *Id*. § 3115(d).

subsistence priority on "public lands," but provides that the United States may step in where the State fails to act.[12]

Persons aggrieved by an alleged failure to enforce the rural subsistence priority are authorized to "file a civil action in the United States District Court for the District of Alaska to require such actions to be taken as are necessary to provide for the priority."[13]

### 2. The State's efforts to protect subsistence uses

Alaska had addressed subsistence uses before ANILCA's passage, and had taken steps to assume the management responsibility that ANILCA contemplated.  A 1978 state law, passed in anticipation of ANILCA becoming law, established "that subsistence hunting and fishing had priority over other uses of fish and game stocks."[14]  The statute identified two tiers of subsistence users based on customary and direct dependence, local residency, and availability of alternative resources.[15]  The state Joint Boards of Fish and Game issued regulations linking subsistence fishing to particular geographic communities,[16] and eventually introducing a rural

---

[12] *See id.* § 3202(a).

[13] *Id.* § 3117.

[14] *McDowell v. State*, 785 P.2d 1, 1–2 (Alaska 1989) (citing Ch. 151 § 4 SLA 1978).

[15] *Id.* at 2.

[16] 5 Alaska Admin. Code § 01.597 (repealed 1985), *reprinted in Madison v. Alaska Dep't of Fish & Game*, 696 P.2d 168, 172 n.8 (Alaska 1985); *see also Bobby v. Alaska*, 718 F. Supp. 764, 767 (D. Alaska 1989).

element to the subsistence preference.[17]   The regulations initially treated towns with fewer than 7,000 people as "rural."[18]   In 1982, the Secretary of the Interior certified Alaska to manage subsistence hunting and fishing on public lands, as ANILCA and the Alaska legislature had intended.

However, in 1985, the Alaska Supreme Court held in *Madison*[19] that the regulations linking subsistence fishing to particular geographic communities were inconsistent with Alaska's subsistence statute.   The court reasoned that the statutory preference was for subsistence users, whether or not they were rural.[20]   Many Alaskans depend heavily on wild fish and game for their protein, whether they live in isolation or in villages, small towns, or cities.   The Secretary of the Interior notified the Governor of Alaska that *Madison*'s holding "raised questions as to the continuing eligibility of the State to manage subsistence on public lands in Alaska," and that Alaska had until June 1, 1986 to "revise its

---

[17] 5 Alaska Admin. Code § 99.010 (1982), *reprinted in Bobby*, 718 F. Supp. at 794–95.

[18] *See* 5 Alaska Admin. Code § 99.020 (1982) ("In this chapter, 'rural' means outside the road connected area of a borough, municipality, or other community with a population of 7,000 or more, as determined by the Alaska Department of Community and regional Affairs."), *reprinted in Bobby*, 718 F. Supp. at 795; *see also Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 314 (9th Cir. 1988), *cert. denied*, 491 U.S. 905 (1989).

[19] *Madison v. Alaska Dep't of Fish & Game*, 696 P.2d 168 (Alaska 1985).

[20] *Madison*, 696 P.2d at 177–78.

subsistence program to bring it back into compliance" with ANILCA's rural subsistence priority requirement.[21]

In response, the Alaska legislature amended the state subsistence statute to expressly limit the definition of subsistence activities to those "'domiciled in a rural area of the state.'"[22] The amended statute defined a "rural area" as "'a community or area of the state in which the noncommercial, customary, and traditional use of fish or game for personal or family consumption is a principal characteristic of the economy of the community or area.'"[23]

Under the amended statute, the State did not treat the Kenai peninsula as rural because it had Sears and Safeway stores and shopping malls. That is, Alaskans tended to use the word "rural" to refer to areas off the road system, rather than sparsely populated agricultural areas, there being few roads and little agriculture in Alaska.[24] Accordingly, Alaska law had provided a subsistence priority to people who largely depended on hunting and fishing for their living. However,

---

[21] Letter from Bill Horn, Assistant Secretary, Fish and Wildlife and Parks, Office of the Secretary, United States Department of the Interior, to Bill Sheffield, Governor of Alaska (Sept. 23, 1985), *reprinted in Bobby*, 718 F. Supp. at 813–15.

[22] *McDowell*, 785 P.2d at 1 (quoting Ch. 52 SLA 1986); *see also Kenaitze*, 860 F.2d at 314.

[23] *McDowell*, 785 P.2d at 2 (quoting Alaska Stat. § 16.05.940(25)).

[24] *See* 5 Alaska Admin. Code § 99.020 (1982) ("In this chapter, 'rural' means *outside the road connected area* of a borough, municipality, or other community with a population of 7,000 or more, as determined by the Alaska Department of Community and regional Affairs.") (emphasis added).

in *Kenaitze Indian Tribe*,[25] the Ninth Circuit reasoned that the Kenai peninsula had "a long way to go before it approaches anything resembling an urban community."[26]   *Kenaitze* held that the state's definition of "rural"—economies dominated by subsistence fishing and hunting—"would exclude practically all areas of the United States that *we* think of as rural, including virtually the entirety of such farming and ranching states as Iowa and Wyoming," and was therefore invalid.[27]   "Rural," *Kenaitze* held, meant something like communities smaller than 2,500 people, or towns or cities outside urban areas with populations not exceeding certain limits.[28]   Thus, under *Kenaitze*, ANILCA's priority applied to people in small communities regardless of whether they depended on hunting and fishing.

In 1989, several months after *Kenaitze* came down, the Alaska Supreme Court concluded in *McDowell*[29] that Chapter 52 SLA 1986, the rural subsistence priority chapter put into the Alaska Code to conform to ANILCA, was in tension with provisions of the Alaska Constitution providing for common use of fish and game and equality of access among those similarly situated.[30]   Though a subsistence preference based on individual characteristics would satisfy the Alaska

---

[25] *Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312 (9th Cir. 1988).

[26] *Id.* at 314 n.2.

[27] *Id.* at 316 (emphasis added).

[28] *Id.* at 317.

[29] *McDowell v. State*, 785 P.2d 1 (Alaska 1989).

[30] *Id.* at 9.

constitution, the rural-urban distinction was an "extremely crude" means to establish such a preference.[31]  That is, many of Alaska's subsistence users lived in what, for Alaska, were "urban" areas, and many people living in what were, under *Kenaitze*, "rural" areas did not extensively rely on subsistence resources.[32]  Accordingly, the Alaska Supreme Court held that the rural subsistence priority chapter provided too poor a fit with Alaska subsistence lifestyles to satisfy state constitutional requirements.[33]

### 3. Federal efforts to implement ANILCA's rural subsistence priority, *Katie John I*, and *Katie John II*

Following *McDowell*, the federal government denied the re-certification Alaska needed under ANILCA to manage its own fish and game.  Implementation of ANILCA's rural subsistence priority accordingly fell back to the federal government in July 1990.  In initial regulations promulgated in 1992 ("1992 Rules"), the Secretaries took the position that "public lands" under Title VIII of ANILCA, or those lands subject to the rural subsistence priority, excluded all navigable waters in Alaska.[34]  This position generated several lawsuits, which were consolidated into a single action.  During the course of that litigation, the Secretaries changed

---

[31] *Id.* at 10.

[32] *Id.* at 10–11.

[33] *Id.* at 9.

[34] *See* Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, and C, 57 Fed. Reg. 22,940, 22,942 (May 29, 1992) (codified at 36 C.F.R. pt. 242 and 50 C.F.R. pt. 100).

their position, arguing instead that some navigable waters were "public lands" by virtue of the federal reserved water rights doctrine, and therefore subject to the rural subsistence priority.[35]

The consolidated lawsuits against the 1992 Rules came before us in *Alaska v. Babbitt* ("*Katie John I*").[36]   We concluded that, because Congress included subsistence fishing in Title VIII, ANILCA applies to *some* of Alaska's navigable waters.[37]   We observed that Title VIII was unclear as to which navigable waters constitute "public lands," but rejected the Katie John plaintiffs' argument, with which the district court had agreed, that "public lands" includes "*all* navigable waters" in Alaska.[38]   We explained that the federal navigational servitude is a "concept of power, not property."[39] Because it did not give the United States any property interest, the navigational servitude did not establish "public lands," the *sine qua non* for application of ANILCA's rural subsistence priority.[40]   Our task, therefore, was to "decide whether the federal agencies' conclusion that public lands include some navigable waters under the reserved water

---

[35] *Alaska v. Babbitt*, 72 F.3d 698, 701 (9th Cir. 1995), *cert. denied*, 517 U.S. 1187 (1996).

[36] *Babbitt*, 72 F.3d 698.

[37] *Id.* at 702.

[38] *Id.* at 703–04 (emphasis added).

[39] *Id.* at 702 (quotation marks omitted).

[40] *Id.* at 702–03.

rights doctrine" was "based on a permissible construction of the statute."[41]

We concluded that it was. We explained that the United States, in "reserv[ing] vast parcels of land in Alaska for federal purposes through a myriad of statutes,"[42]

> has also implicitly reserved appurtenant waters, including appurtenant navigable waters, to the extent needed to accomplish the purposes of the reservations. By virtue of its reserved water rights, the United States has interests in some navigable waters. Consequently, public lands subject to subsistence management under ANILCA include certain navigable waters.[43]

We held that the "federal agencies that administer the subsistence priority are responsible for identifying those waters."[44] We recognized that this directive placed an "extraordinary administrative burden" on the Secretaries, that ANILCA contemplated a robust role for the State in managing ANILCA's rural subsistence priority, and that "[o]nly legislative action by Alaska or Congress will truly

---

[41] *Id.* at 702.

[42] *Id.* at 703.

[43] *Id.*

[44] *Id.* at 700, 704; *see also id.* at 704 (expressing "hope that the federal agencies will determine promptly which navigable waters are public lands subject to federal subsistence management").

resolve the problem" of how best to manage ANILCA's rural subsistence priority vis-à-vis Alaskan waters.[45]

Following *Katie John I*, the Secretaries issued the 1999 Rules, which "amend[ed] the scope and applicability of the Federal Subsistence Management Program in Alaska to include subsistence activities occurring on inland navigable waters in which the United States has a reserved water right and to identify specific Federal land units where reserved water rights exist."[46] Rather than listing specific bodies of water that are "public lands" by virtue of the federal reserved water rights doctrine, the 1999 Rules identify "Federal land units in which reserved water rights exist."[47] The 1999 Rules provide that the Rules apply to "all public lands including all non-navigable waters located on these [land units], on all navigable and non-navigable water within the exterior boundaries of the [land units], and on inland waters adjacent to the exterior boundaries of the [land units]."[48] The 1999 Rules list thirty-four separate "Federal land units" subject to this general rule of applicability.[49] The 1999 Rules also,

---

[45] *Id.* at 704.

[46] Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, C, and D, Redefinition to Include Waters Subject to Subsistence Priority, 64 Fed. Reg. 1,276, 1,276 (Jan. 8, 1999) (codified at 36 C.F.R. pt. 242 and 50 C.F.R. pt. 100).

[47] *Id.*

[48] *Id.* at 1,286–87.

[49] *Id.* at 1,287. These land units are a mix of ANILCA conservation system units and other federal reservations.

pursuant to § 906(o)(2) of ANILCA,[50] extend rural subsistence priority management "to all Federal lands selected under the Alaska Native Claims Settlement Act and the Alaska Statehood Act and situated within the boundaries of a Conservation System Unit, National Recreation Area, National Conservation Area, or any new national forest or forest addition, until conveyed to the State of Alaska or an Alaska Native Corporation."[51]

In 2000, the district court, which had retained jurisdiction over the consolidated challenges to the 1992 Rules on remand from *Katie John I*, concluded that the action should not serve as the vehicle for challenges to the 1999 Rules. The court issued an order "readopting all of its rulings on the merits," deeming those rulings final "for all purposes and to all parties," and dismissing the case.

The State of Alaska appealed this final judgment, arguing that the "clear statement doctrine"[52] precluded the determination that any navigable waters in Alaska could constitute "public lands." We granted initial en banc rehearing.[53] In a per curiam opinion, we wrote that "[a]

---

[50] 43 U.S.C. § 1635(o)(2); *see infra* 62–65 (discussing § 906(o)(2)).

[51] 64 Fed. Reg. at 1,276.

[52] *See, e.g.*, *United States v. Bass*, 404 U.S. 336, 349 (1971) ("In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.").

[53] *See John v. United States*, 247 F.3d 1032 (9th Cir. 2001) (en banc) ("*Katie John II*").

majority of the en banc court has determined that the judgment rendered by the [*Katie John I*] panel, and adopted by the district court, should not be disturbed or altered by the en banc court."[54]  In an opinion concurring in the judgment, three judges took the position that the federal reserved water rights doctrine does not limit the scope of ANILCA's rural subsistence priority; rather, because Congress was exercising its authority under the Commerce Clause when it enacted ANILCA, the priority applied to all navigable waters in Alaska.[55]  In a dissenting opinion, three judges took the position that ANILCA did not provide the necessary "clear statement"—that Congress sought to take away "important incidents of a state's sovereignty"—to make navigable waters within Alaska subject to federal control.[56]  They also argued that the United States does not have "title" to Alaskan waters or the lands underlying them.[57]  For these reasons, they concluded that *no* navigable waters are "public lands" under ANILCA.[58]  Since neither of these opinions garnered a majority of votes, *Katie John I* remains controlling.

---

[54] *Id.* at 1033.

[55] *Id.* at 1034 (Tallman, J., concurring in the judgment).

[56] *Id.* at 1045–46 (Kozinski, J., dissenting).

[57] *Id.* at 1046–47 (Kozinski, J., dissenting) (citing 16 U.S.C. § 3102(1)–(3)).

[58] *Id.* at 1048–49 (Kozinski, J., dissenting).

## B. The current litigation

The current litigation includes two consolidated challenges to the 1999 Rules.[59]   In the first challenge, Plaintiffs-Appellants Katie John, et al., argue that the 1999 Rules violate ANILCA because they fail to provide the rural subsistence priority for (1) the navigable waters upstream and downstream from the conservation system units created under ANILCA, and (2) waters appurtenant to lands allotted to Alaska Natives under the Alaska Native Allotment Act of 1906. The State of Alaska intervened as a defendant. In the second challenge, the State of Alaska, along with several intervenors, argue, in essence, that the regulations violate ANILCA by designating as "public lands" (1) waterways outside the boundaries of federal lands, conservation system units, or national forests; (2) water that constitutes "marine water"; and (3) land selected for but not yet conveyed to Alaska or a Native corporation. The Katie John plaintiffs, as well as the Alaska Federation of Natives, intervened as defendants.

Thus, both challenges assert that the Secretaries improperly interpreted and applied the federal reserved water rights doctrine. For the Katie John plaintiffs, the Secretaries were too restrained in applying the doctrine; for the State, the Secretaries were not restrained enough. Both challenges also assert that the 1999 Rules are not entitled to deference under

---

[59] In 2005, the Secretaries published amendments to the 1999 Rules to "revise[ ] and clarif[y] the jurisdiction of the Federal Subsistence Management Program for certain coastal areas in Alaska." Subsistence Management Regulations for Public Lands in Alaska, Subpart A, 70 Fed. Reg. 76,400, 76,400 (Dec. 27, 2005) (codified at 36 C.F.R. pt. 242 and 50 C.F.R. pt. 100).  These amendments are not at issue in these appeals, except where noted below.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Finally, the State of Alaska argues that the Secretaries should have used adjudication, not rulemaking, to implement *Katie John I*.

The district court issued two decisions—which we and the parties refer to as "what process" and "which waters" decisions—in which it rejected all the challenges to the 1999 Rules.  In its "what process" decision, the district court concluded that "the Secretaries' use of the rulemaking process to identify reserved water rights for purposes of federal subsistence management was lawful."  In the "which waters" decision, the court discussed the "test case" waterways submitted by the litigants and concluded that the Secretaries' designation of which waters constitute "public lands" was "lawful and reasonable."  The parties timely appealed.

## ANALYSIS

### A.  Threshold issues

#### 1.  The federal reserved water rights doctrine

In *Katie John I*, we approved the Secretaries' use of the federal reserved water rights doctrine to identify which waters are "public lands" for purposes of ANILCA's rural subsistence priority.  Because that doctrine underlies the 1999 Rules, the parties' arguments in this case, and our conclusions, some background on the doctrine and its place in Alaska's history is necessary.

Congress had unfettered power to regulate the Territory of Alaska from 1867, when the United States purchased the

land from Russia, until 1959, when the Territory attained statehood.[60]  Under the "equal footing" doctrine, when Alaska was "admitted into the Union, it gain[ed] 'the same rights, sovereignty and jurisdiction in that behalf as the original States possess within their respective borders.'"[61]  More specifically, the equal footing doctrine gave Alaska "presumptive title to its submerged lands when it join[ed] the Union."[62]  "The shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively. . . .  The new states have the same rights, sovereignty, and jurisdiction over this subject as the original states."[63]  Thus the State of Alaska has the same rights over lands under navigable waters within it as, say, the State of New York and the State of California do over such waters within their borders.  This authority is constrained by two separate federal rights: the navigational servitude and the federal reserved water rights doctrine.

"It is settled law in this country that lands underlying navigable waters within a state belong to the state in its sovereign capacity and may be used and disposed of as [the state] may elect, subject to the paramount power of Congress

---

[60] The U.S. Constitution gives Congress "the power to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States."  U.S. Const. art. IV, § 3.

[61] *United States v. 32.24 Acres of Land*, 683 F.3d 1030, 1035 (9th Cir. 2012) (quoting *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 474 (1988)).

[62] *Id.* at 1034.

[63] *Pollard v. Hagan*, 44 U.S. 212, 230 (1845).

to control such waters for the purposes of navigation in commerce among the states and with foreign nations . . . ."[64] Thus, where rivers and streams are navigable in interstate commerce, the United States has authority to protect a navigational servitude, but the states own the river beds and other submerged lands.

Since 1908, the courts have also recognized that a federal reservation of land carries with it the right to use water necessary to serve the purposes of federal reservations. Under the federal reserved water rights doctrine, water rights for federal reservations are distinct from the federal servitude for navigable waters. So, for example, in *Winters v. United States*,[65] a non-navigable stream was protected upstream despite the admission of Montana to statehood and despite its non-navigability, because diverting the upstream water could turn the downstream Indian reservation into a "barren waste," which would be inconsistent with reservation of the land for the use of the tribe.[66]

*Winters* involved an Indian reservation, but the federal reserved water rights doctrine applies to all federal reservations.[67] The word "reservation" does not mean only an Indian reservation—there is only one Indian reservation in Alaska, the Metlakatla Indian Community of Tsimshian Indians at the Annette Islands Reserve south of

---

[64] *United States v. Holt State Bank*, 270 U.S. 49, 54 (1926).

[65] *Winters v. United States*, 207 U.S. 564 (1908).

[66] *Id.* at 577.

[67] *Akiak Native Cmty. v. EPA*, 625 F.3d 1162, 1173 n.5 (9th Cir. 2010).

Ketchikan—but rather "any body of land, large or small, which Congress has reserved from sale for any purpose."[68] Reservations in Alaska serve a variety of purposes, such as military bases and parks. *Cappaert v. United States*,[69] a modern case, shows how the federal reserved water rights doctrine works outside the context of an Indian reservation. In *Cappaert*, the federal reservation of a national monument featuring a notable pool of water required enough water to fill the pool to protect an endangered species living there. As a result, the state could not grant a permit to a ranch two and one-half miles away to pump so much groundwater that the pool (and the species) would be further endangered. The Supreme Court held that a federal reservation acquires for the federal government a right to "appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation," regardless of whether the waters are navigable or nonnavigable.[70] The federal right, though, "reserves only that amount of water necessary to fulfill the purpose of the reservation, no more."[71] In *United States v. New Mexico*,[72] the Court reiterated that the federal reserved water rights doctrine is limited to the quantity of water necessary to fulfill the primary purposes of the reservation.[73]

---

[68] *United States v. Celestine*, 215 U.S. 278, 285 (1909); *see also Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 693 (9th Cir. 2004).

[69] *Cappaert v. United States*, 426 U.S. 128 (1976).

[70] *Id.* at 138.

[71] *Id.* at 141.

[72] *United States v. New Mexico*, 438 U.S. 696 (1978).

[73] *Id.* at 716–18.

Notably, in these cases the United States sought water itself, for the need of the reservation itself.  In *Winters*, the water was needed on an Indian reservation for the Indians' farms and ranches, and in *Cappaert* for the deep pool of water for which the federal land was reserved.  In *New Mexico* the Supreme Court held that federally reserved waters are limited to the *primary* purposes for which the land was reserved, without which "the purposes of the reservation would be entirely defeated."[74]  Applying this narrow rule, the Court rejected a federal claim to water rights for "aesthetic, environmental, recreational, or wildlife-preservation purposes," because those were not the primary purposes for which the national forest lands at issue had originally been reserved.[75]

What makes this case difficult is that, until now, the federal reserved water rights doctrine has operated in the context of the United States enforcing its right to that amount of water necessary to fulfill the purpose of a particular reservation.[76]  That is, previous applications of the federal reserved water rights doctrine have focused on the amount of water needed for a specific federal reservation, rather than the locations of water sources that might generally be needed for

---

[74] *Id.* at 700.

[75] *Id.* at 708, 713–15; *see also id.* at 700 ("Each time this Court has applied the 'implied-reservation-of-water doctrine,' it has carefully examined both the asserted water right and the specific purposes for which the land was reserved, and concluded that without the water the purposes of the reservation would be entirely defeated.").

[76] *See, e.g.*, *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 46–47 (9th Cir. 1981) (first considering the existence of water rights and then considering the amount of water reserved).

subsistence living from many such reservations.  We, and perhaps the Secretaries, failed to recognize the difficulties in applying the federal reserved water rights doctrine in this novel way, and in retrospect the doctrine may provide a particularly poor mechanism for identifying the geographic scope of ANILCA's rural subsistence priority management when it comes to water.

Of course, we had the opportunity to revisit *Katie John I* in *Katie John II*, and while a majority of the en banc court agreed for diverging reasons that *Katie John I* was incorrectly decided, we could not come to a controlling agreement about why that was true.[77]   We accordingly concluded that the decision "should not be disturbed or altered."[78]   *Katie John I* therefore remains controlling law, and we must attempt to apply it in this case.

## 2.  Rulemaking versus adjudication

The State argues that the Secretaries were required to adjudicate, rather than prescribe by rule, which waters the United States has an interest in by virtue of the federal reserved water rights doctrine.  The State argues that an adjudicative process "is necessary because a right is being established and one entity's water right burdens and diminishes the right and interests of another."

---

[77] *Katie John I* was issued as a two-judge majority, with one dissenting opinion.  *See* 72 F.3d at 704–08 (Hall, J., dissenting).  In *Katie John II*, three judges concurring in the judgment thought that *Katie John I* erred in failing to uphold a rural subsistence priority over all navigable waters and three dissenting judges were of the view that it erred in applying the priority over any navigable waters.  *See* 247 F.3d at 1034–50.

[78] *Katie John II*, 247 F.3d at 1033.

The State is correct that, until this point, the federal reserved water rights doctrine has been applied to adjudicate competing claims to water, a task that requires an adjudicator to allocate use of water among the claimants. The State, however, fails to appreciate the distinction between the adjudication of the amount of federal reserved water rights and the identification of the geographic scope of those rights for purposes of administering ANILCA's rural subsistence priority. The Secretaries were charged with the latter task, *i.e.*, identifying those bodies of water to which the rural subsistence priority might apply by virtue of the federal reserved water rights doctrine. Thus, the 1999 Rules identify the bodies of waters in which the Secretaries believe the United States has a federal reserved water rights interest (for purposes of administering ANILCA), but they do not actually allocate or reserve any water in these bodies. In other words, the rules do not purport to assert rights over a particular amount of water, nor do they do anything to displace future water rights litigation. The agencies are not, therefore, "determining their own water rights," nor does their rulemaking burden the State's right to use water.[79]

Two implications flow from this observation. First, as long as water remains abundant in the identified bodies,

---

[79] Because the 1999 Rules do not actually burden the State's right to use water, they do not infringe upon ANILCA's water rights savings clause. *See* 16 U.S.C. § 3207 ("Nothing in [ANILCA] shall be construed as limiting or restricting the power and authority of the United States or . . . as affecting in any way any law governing appropriation or use of, or Federal right to, water on lands within the State of Alaska[, or] as expanding or diminishing Federal or State jurisdiction, responsibility, interests, or rights in water resources development or control.").

allocation of their waters may never become necessary.[80]
Second, any future attempt by the United States to enforce its
right to reserved water in a particular body *could* burden the
State's use of water. At that point, the State could challenge
the quantitative scope of the United States' reservation.
Indeed, in the context of a particular enforcement action, the
State could take the position that no amount of water from a
particular identified source is necessary to fulfill the primary
purposes of the reservation. But, to reiterate, the 1999 Rules
do not displace or otherwise affect future water rights
litigation; they were promulgated merely for the purposes of
administering Title VIII of ANILCA and complying with
*Katie John I*.

For these reasons, we hold that the Secretaries
appropriately used notice-and-comment rulemaking, rather
than adjudication, to identify those waters that are "public
lands" for the purpose of determining the scope of ANILCA's
rural subsistence priority. The use of rulemaking is
consistent with ANILCA, which requires the federal
government to "prescribe such regulations as are
necessary,"[81] and with our decision in *Katie John I*, where we
expressed our "hope that the federal agencies will determine
promptly which navigable waters are public lands subject to
federal subsistence management."[82] A more particularized
approach could not have fulfilled the requirement that the
federal agencies make their determination "promptly," since

---

[80] *See New Mexico*, 438 U.S. at 699 (recognizing that, where water is
abundant, there is no need to determine the relative rights of various
claimants of water from a particular source).

[81] 16 U.S.C. § 3124.

[82] *Katie John I*, 72 F.3d at 704.

Alaska constitutes about one-sixth of the entire United States, and most of its coastline.  In directing the Secretaries to make this determination, we could not have intended to require the agencies to initiate individual water rights adjudication proceedings for each identified body of water, particularly when the purpose of the directive was not to allocate water, but to identify which bodies of water constituted "public lands" for purposes of ANILCA's rural subsistence priority.  Logically, we intended the agencies to act through rulemaking, where doing so was feasible.

### 3.   The standards of review and *Chevron* deference

This case presents questions of law, which we review *de novo*.[83]   "De novo review of a district court judgment concerning the decision of an administrative agency means we view the case from the same position as the district court."[84]   Under the Administrative Procedure Act,[85] we ask whether an agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority."[86]

---

[83] *Sauer v. U.S. Dep't of Educ.*, 668 F.3d 644, 650 (9th Cir. 2012).

[84] *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002) (internal quotation marks and citation omitted).

[85] 5 U.S.C. §§ 701–706.

[86] *Id*. § 706(2).  The State incorrectly argues that we must review the Katie John plaintiffs' arguments under § 706(1), for agency action "unlawfully withheld or unreasonably delayed."  The Katie John plaintiffs challenge the validity of an agency action (the 1999 Rules), not an agency's alleged failure to act. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62–63 (2004).

The district court determined that, because the Secretaries are charged with administering ANILCA, deference was warranted for questions of statutory interpretation under *Chevron*.[87]  Applying *Chevron* deference involves a two-step inquiry: if Congress has "directly spoken to the precise question at issue," then the court must "give effect to the unambiguously expressed intent of Congress."[88]  If instead the "statute is silent or ambiguous with respect to the specific issue," the court defers to the administering agency's interpretation as long as it reflects "a permissible construction of the statute."[89]

We generally agree with the district court that *Chevron* deference applies to questions of ANILCA's interpretation in this case, where ANILCA is ambiguous as to the answer.  In promulgating the 1999 Rules, the Secretaries were identifying those bodies of water in which the United States may claim an interest by virtue of the federal reserved water rights doctrine, and which thereby qualify as "public lands" for purposes of administering ANILCA's rural subsistence priority.   The Secretaries are expressly charged with administering that priority when the state does not enact law

---

[87]  *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).

[88]  *Id.* at 842–43.

[89]  *Id.* at 843.

that implements it.[90]  In construing the term "public lands," therefore, the Secretaries are entitled to some deference.[91]

We say "some deference" because this is not a typical administrative law case, where an agency is simply applying its expertise in implementing a substantive statute.  Instead, the Secretaries are applying, in a novel way, a judicially created doctrine to implement ANILCA.  The courts have a strong role in defining the contours of such doctrines.[92]

## B.  The merits

As an initial matter, the State argues that the 1999 Rules are invalid because they do not expressly address the "elements" of the federal reserved water rights doctrine with respect to each of the identified 34 reservation units.  That is, the Secretaries failed to state the purpose of the land

---

[90] *See* 16 U.S.C. § 3115(a)(1) (providing for subsistence program implementation by the Secretaries, in consultation with the State); *id*. § 3115(d) ("The Secretary shall not implement subsections (a), (b), and (c) of this section if the State enacts and implements laws of general applicability which are consistent with, and which provide for the definition, preference, and participation specified in . . . this title . . . .").

[91] *See Katie John I*, 72 F.3d at 702; *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1191–92 (9th Cir. 2000) (holding that the agency's interpretation of ANILCA is entitled to deference).

[92] *See, e.g.*, *Morris v. Commodity Futures Trading Comm'n*, 980 F.2d 1289, 1293 (9th Cir. 1992) ("Where the question to be decided involves matters of particular expertise of the agency, the deferential standard should be applied.  But judicial deference is not necessarily warranted where courts have experience in the area and are fully competent to decide the issue.") (citation omitted).

reservation and the amount of water necessary for each reserved unit.

However, these steps were not necessary for the Secretaries to identify which bodies of water constitute "public lands" under ANILCA. The administrative record reveals the bases for asserting federal reserved water rights with regard to each unit, and nothing in the identification process pertains to the amount of water reserved in each body of water, which is still open to future determination by the appropriate adjudicator. It falls to us to determine whether the Secretaries' decisions are arbitrary or capricious.

### 1. Adjacent waters

The State argues that, in the 1999 Rules, the Secretaries improperly included within the definition of "public lands" waters "adjacent to," but not physically on, federally reserved land. In the State's view, federal reserved water rights arising by implication exist only within the borders of the federal reservations, not beyond them. Even if such rights may be invoked to enjoin the use of waters outside the boundaries of a federal reservation, the State argues that the rights themselves exist only in the waters that are within the boundaries of the reservation.

We disagree. The federal reserved water rights doctrine allows the United States to reserve waters "appurtenant" to federally reserved lands in order to fulfill the purposes of that reservation.[93] While the cases do not define "appurtenancy,"

---

[93] *See New Mexico*, 438 U.S. at 698 (recognizing Congressional authority "to reserve unappropriated water in the future for use on *appurtenant* lands") (emphasis added); *Katie John I*, 72 F.3d at 703

there is an apparent consensus that it does not mean physical attachment:

> The reserved water rights doctrine holds that the government impliedly withdrew its consent to creation of private rights each time it earmarked public lands for a specific federal purpose to the extent necessary to fulfill that purpose. Thus, the fact that a reservation was detached from water sources does not prove an absence of intent to reserve waters some distance away. Judicial references to such rights being "appurtenant" to reserved lands apparently refer not to some physical attachment of water to land, but to the legal doctrine that attaches water rights to land to the extent necessary to fulfill reservation purposes.[94]

As the district court recognized, "[a]ppurtenancy has to do with the relationship between reserved federal land and the use of the water, not the location of the water."

---

("Under the reserved water rights doctrine, when the United States withdraws its lands from the public domain and reserves them for a federal purpose, the United States implicitly reserves appurtenant waters then unappropriated to the extent needed to accomplish the purpose of the reservation."); *Walton*, 647 F.2d at 46 ("Where water is needed to accomplish [the purposes of federal land withdrawn from the public domain], a reservation of appurtenant water is implied.").

[94] David H. Getches, *Water Law* 349–50 (4th ed. 2009); *see also* *4 Waters and Water Rights* § 37.01(b)(3) (Robert E. Beck ed., 1991 ed., repl. vol. 2004) ("[R]eserved rights may be drawn from water sources that do not traverse or border on reservations.").

No court has ever held that the waters on which the United States may exercise its reserved water rights are limited to the water within the borders of a given federal reservation. Instead, the Supreme Court has recognized that federal water rights may reach sources of water that are separated from, but "physically interrelated as integral parts of the hydraulic cycle" with, the bodies of water physically located on the reserved land.[95]  In *Cappaert*, the Court held that the United States could enjoin the use of groundwater two and one-half miles from Devil's Hole because the federal reserved water rights doctrine is "based on the necessity of water for the purpose of federal reservation," rather than the location of the water.[96]  The relevant question, then, is not where these waters are located, but rather whether these waters are "appurtenant" to the reserved land.  And if the waters are "appurtenant" to the reserved land, they may be subject to future enforcement of federal reserved water rights if the other requirements for asserting a federal reserved water right are met.

Each federal reservation listed in the 1999 Rules was created for an express set of statutory purposes.[97]  These

---

[95] *Cappaert*, 426 U.S. at 133, 142 (internal citation and quotation marks omitted).

[96] *Id*. at 143; *see also United States v. Orr Water Ditch Co.*, 600 F.3d 1152, 1158 (9th Cir. 2010) (recognizing that a tribe's water rights to surface water protected it against diminution resulting from allocation of groundwater, because of the "reciprocal hydraulic connection between groundwater and surface water").

[97] The 1999 Rules provide that the regulations will apply to "inland waters adjacent to the exterior boundaries of" 34 different "areas." Several of the identified "areas" actually include multiple reservations or units.  Sixteen of the "areas" are national wildlife refuges established,

purposes may require water not only from the water sources on the lands themselves, but also from surrounding areas. For example, the majority of the federal reservations identified in the 1999 Rules are to be managed "to protect habitat for, and populations of" fish and wildlife[98] or "to conserve fish and wildlife populations and habitats."[99] The State does not dispute that the wildlife in these reservations readily use the waters adjacent to the reservations.[100] Due to the proximity and connectivity of these adjacent waters to the reserved land, and given the fact that the federal reserved water rights doctrine allows the United States to exert rights over water

expanded or redesignated by ANILCA. Twelve of the "areas" include one or more units of the National Park System established, expanded or redesignated by ANILCA. The remaining six "areas" include two national forests (the Chugach and the Tongass), one National Conservation Area, one National Recreation Area, the National Petroleum Reserve in Alaska, and all components of the Wild and Scenic River System located outside the boundaries of National Park, National Preserves or National Wildlife Refuges. Only the National Petroleum reserve was not established, expanded or redesignated by ANILCA.

[98] *See* ANILCA §§ 201, 202 (codified at 16 U.S.C. 410hh, 410hh-1). Sixteen of the 17 National Park System units listed in the 1999 Rules have the identified purpose "to protect habitat for, and populations of" fish and wildlife. The remaining National Park System unit, the Glacier Bay National Preserve, has the purpose to "protect a segment of the Alsek River, fish and wildlife habitats and migration routes."

[99] *See* ANILCA §§ 302, 303. All 16 of the National Wildlife Refuges named in the 1999 Rules have a primary purpose "to conserve fish and wildlife populations and habitats in their natural diversity."

[100] *Cf. United States v. Alaska*, 423 F.2d 764, 767 (9th Cir. 1970) (rejecting the argument that the Kenai National Moose Range did not reserve water rights in navigable water because this would leave "only mountains, hills, ridges, valleys and barren areas . . . for the moose to feed and breed").

that is "physically interrelated" with the reserved land, the Secretaries reasonably concluded that adjacent waters are appurtenant to, and may be necessary to fulfill the primary purposes of, the federal reservations identified in the 1999 Rule, and are sources from which the United States could at some point claim a reservation of water.  Accordingly, the Secretaries reasonably concluded that the United States has an "interest" in these adjacent waters by virtue of the federal reserved water rights doctrine sufficient to qualify as "public lands" for purposes of Title VIII.[101]

There is a broader point to be made here.  As discussed above, the federal reserved water rights doctrine does not typically assign a geographic location to implied federal water rights.  The rights are created when the United States reserves land from the public domain for a particular purpose, and they exist to the extent that the waters are necessary to fulfill the primary purposes of the reservation.[102]  The United States may enforce this implied right in a particular, appurtenant body of water, and it is at this point that the right takes on a geographical dimension.  The existence of the right, therefore, has no physical location separate and distinct from the waters on which the right can be enforced.  For purposes of this case, then, we must include within its potential scope all the bodies of water on which the United States' reserved rights could at some point be enforced—*i.e.*, those waters that are or may become necessary to fulfill the primary purposes of the federal reservation at issue.  Because this potential scope in hypothetical scenarios is immensely

---

[101] *See Katie John I*, 72 F.3d at 703 ("By virtue of its reserved water rights, the United States has interests in some navigable waters.").

[102] *Cappaert*, 426 U.S. at 139.

broad, it runs up against the conclusion in *Katie John I* that not all navigable waters are included in the rural subsistence priority. That judgment reflects the practical view that the federal reservations are unlikely to need all the water even in some of the greatest rivers in the world. It was reasonable for the Secretaries to conclude that a federal reserved water right existed in adjacent waters to serve all of the purposes of the reservations. The Secretaries also concluded, however, that the needs of subsistence uses did not justify expansion to vast reaches of waters upstream and downstream. For reasons we will explain when we address that issue below, we conclude that this decision of the Secretaries was also reasonable.

## 2. Specific water bodies

The State challenges the designation of specific bodies of water as "public lands for purposes for ANILCA." We consider each challenge in turn.

### a. Sixmile Lake

The State argues that Sixmile Lake should not be considered a "public land" subject to federal subsistence management because the Lake's shoreline is non-federal, non-public land owned primarily by the Native Village Corporation for Nondalton.[103] Therefore, the State argues, Sixmile Lake is not within any federal reservation and does not touch federally reserved land.

---

[103] *See* ANILCA § 201(7)(b), 16 U.S.C. § 410hh(7)(b) (providing that "[n]o lands conveyed to the Nondalton Village Corporation shall be considered to be within the boundaries of the park or preserve").

However, the agency map of the Lake Clark National Park and Preserve[104] places the Park's boundary at the shoreline of Sixmile Lake. ANILCA provides that, "[i]n the event of discrepancies between the acreages specified in this Act and those depicted on such maps, the maps shall be controlling."[105] The Secretaries therefore properly concluded that Sixmile Lake was in fact adjacent to the Lake Clark National Park and Preserve. Moreover, under the federal reserved water rights doctrine, the Secretaries must show only that the waters are positioned such that the United States may need to exercise its rights upon them. For that reason, the formal ownership of the land immediately along the shoreline of Sixmile Lake is not dispositive, so long as the lake contains water that is or might be necessary to fulfill the primary purposes of the Lake Clark National Park and Preserve. The State does not dispute that, due to its location, the United States has such an interest in Sixmile Lake. We therefore affirm the Secretaries' determination that Sixmile Lake is a "public land" subject to ANILCA's rural subsistence priority.

### b.   Seven Juneau-area streams

The State argues that the Secretaries improperly declared seven streams in the Juneau area "public lands" under ANILCA. The upper reaches of these streams are in the Tongass National Forest, but, according to the State, they also flow through many lands in the Juneau area that are not federally owned. The State contends that the determination

---

[104] *See* National Park System Units in Alaska; Description of Boundaries, 57 Fed. Reg. 45,166, 45,220 (Sept. 30, 1992).

[105] 16 U.S.C. § 3103.

that the United States has an interest in these waters is erroneous because they are "exterior waters downstream of the reservation."

The parties disagree about whether the streams in question fall completely within the boundaries of the Tongass National Forest, or whether a portion of the streams lies outside of these boundaries.  None of the maps offered by the parties is entirely conclusive.  The map upon which the Secretaries relied, however, does indicate that the entire streams fall within the exterior boundaries of the Tongass National Forest.  It was not unreasonable for the Secretaries to rely on it instead of the map or other evidence offered by the State.[106]  We therefore uphold the Secretaries' inclusion of these streams within the definition of "public lands."

### c.  Water on inholdings

The Secretaries included within the definition of "public lands" all navigable and non-navigable water within the outer boundaries of the 34 listed land units.[107]  Within these units, however, also lie State and privately owned lands, referred to as "inholdings."  ANILCA expressly provides that lands that have been conveyed to Alaska, a Native corporation, or a private individual, even if such lands are within the boundaries of a conservation system unit, are not subject to

---

[106] *See Union Oil Co. of Cal. v. FPC*, 542 F.2d 1036, 1040 (9th Cir. 1976) (stating that rulemaking is not the kind of adjudicative procedure for which the Administrative Procedure Act specifies a "substantial evidence" standard of review).

[107] *See* 64 Fed. Reg. at 1,286–87 (codified at 36 C.F.R. § 242.3(b), 50 C.F.R. § 100.3(b))

regulation under Title VIII of ANILCA.[108]  The State argues that designating waters that lie on such "inholdings" as "public lands" runs contrary to the principle that only waters appurtenant to reserved federal lands can contain a federally reserved water right.

However, water rights that the United States impliedly acquires are not forfeited or conveyed to third parties when the government conveys to another party land within a federal reservation.[109]  Furthermore, federal reserved water rights can reach waters that lie on inholdings as long as those waters, based on their location and proximity to federal lands, are or may become necessary for the primary purposes of the federally reserved land.  Because these water bodies are actually situated within the boundaries of federal reservations, it is reasonable to conclude that the United States has an interest in such waters for the primary purposes of the reservations.  We therefore uphold the Secretaries' inclusion of these waters within "public lands."

### d. Coastal waters and the "headland-to-headland" method

Section 103(a) of ANILCA provides that federal reservation boundaries "shall, in coastal areas, not extend seaward beyond the mean high tide line to include lands owned by the State of Alaska unless the State shall have

---

[108]  16 U.S.C. § 3103(c).

[109]  *See Winters*, 207 U.S. at 577 (holding that the United States' reservation of water in the Milk river for the Fort Belknap Indian Reservation was not repealed when Montana was admitted to the union); *Arizona*, 373 U.S. at 596–99; *Walton*, 647 F.2d at 48–49.

concurred in such boundary extension."[110]  In the 1999 Rules, the Secretaries defined "inland waters" as "those waters located landward of the mean high tide line or the waters located upstream of the straight line drawn from headland to headland across the mouths of rivers or other waters as they flow into the sea."[111]    This boundary represents the Secretaries' determination of "where the river ends and the sea begins," that is, the line that separates inland waters from marine waters.[112]  Creation of such a boundary was necessary because, as the Secretaries recognize, federal reserved water rights have never been held to exist in marine waters.[113]

The State contends that the Secretaries' use of the "headland-to-headland" method improperly places marine and tidal waters under federal management because, in § 103(a), Congress placed the boundary of federal control at the high tide line.  The Secretaries respond that, because they can assert federal reserved water rights in "tidally influenced waters," their use of the headland-to-headland method was a reasonable way of designating the boundary of federal rural subsistence priority management.

---

[110] 16 U.S.C. § 3103(a).

[111] 64 Fed. Reg. at 1,287 (codified at 36 C.F.R. § 242.4 and 50 C.F.R. § 100.4).

[112] 70 Fed. Reg. at 76,402.

[113] In the 2005 amendments, the Secretaries clarified that the 1999 Rules do not identify any marine waters as "public lands" by virtue of the federal reserved water rights doctrine.  70 Fed. Reg. at 76,401 ("[N]either the 1999 regulations nor this final rule claims that the United States holds a reserved water right in marine waters as defined in the existing regulations.").

We agree with the Secretaries.  The boundary Congress set forth in § 103(a) establishes only the physical boundary for the federal reservations themselves; it does not set the limit for the water over which the United States may exert any interest.  As discussed above, a federal interest by virtue of the federal reserved water rights doctrine may exist in waters adjacent to, but outside the boundary of, a federal reservation, as long as these waters are appurtenant to the reservation.   Because the headland-to-headland method includes tidally influenced waters that are physically connected to, and indeed practically inseparable from, waters inland of the high tide line (or waters on the federal reservations themselves), drawing of the boundary line in this manner is consistent with the  federal reserved water rights doctrine.   Finally, as the Secretaries explain in the 2005 amendments, "the regulations use the methodology found in the Convention on the Territorial Sea and Contiguous Zone from the United Nations Law of the Sea for closing the mouths of rivers."[114]  For these reasons, using the headland-to-headland approach for purposes of determining the boundaries of rural subsistence priority management is a reasonable way to administer ANILCA.

### 3.   Upstream and downstream waters

The 1999 Rules apply the federal rural subsistence priority to waters within and adjacent to the federal reservations listed in the Rules.  We have explained why the State of Alaska's argument—that the federal priority should not extend to adjacent waters—does not have merit.

---

[114] *Id.* at 76,402.

However, the Secretaries did not make claim to waters farther afield from the federal reservations, waters we refer to as "upstream and downstream waters." The Secretaries justified their decision to exclude upstream and downstream waters on the grounds that the United States had no such general practice, no Indian treaty rights were involved, and such reservation "would conflict with the parts of the *Katie John [I]* decision holding that ANILCA did not extend subsistence fishing to all navigable waters in Alaska."

The Katie John plaintiffs argue that the federal priority should apply to waters upstream and downstream from federal reservations—a position that would subject most of the rivers and streams in Alaska to the federal priority, since the federal reservations listed in the 1999 Rules cover about one-half of Alaska.[115] We reject this argument, and hold that the Secretaries did not act arbitrarily or contrary to law in refusing to extend the federal rural subsistence priority to waters upstream and downstream from federal reservations. We base our conclusion on the limits of the federal reserved water rights doctrine, the primary purposes of the federal reservations at issue in the 1999 Rules, the history (and

---

[115] The Katie John plaintiffs' complaint asks for "a declaratory judgment that reserved waters extend upstream and downstream of CSUs." "CSU" stands for "conservation system unit," which is a defined term in ANILCA. The 1999 Rules cover some, but not all, of the ANILCA conservation system units. The 1999 Rules also cover some federal reservations that are not "conservation system units," such as the National Petroleum Reserve in Alaska. It is unclear whether the Katie John plaintiffs argue that upstream and downstream waters are necessary for all of the reservations listed in the 1999 Rules, or only those that are conservation system units. It is also unclear whether the Katie John plaintiffs seek a declaratory judgment that applies to conservation system units that are not listed in the 1999 Rules. Because we conclude that the 1999 Rules are reasonable, we need not resolve these ambiguities.

limits) of ANILCA's rural subsistence priority, and *Katie John I* and *II*.  As we will explain, there is no shortage of water on the ANILCA reservations, so any need for additional water beyond adjacent waters for general purposes of wilderness preservation is too remote to require the Secretaries to identify upstream and downstream waters as subject to a reserved right.  The question then is whether ANILCA's priority for rural subsistence uses somehow requires a more expansive identification of reserved rights.  For the reasons that follow, we conclude that it does not.

### a. The history of ANILCA's rural subsistence priority

As our previous discussion makes clear, ANILCA makes "subsistence uses" of fish and wildlife a priority "on public lands."  Though stated in broad terms, the priority is not without limits.

Some historical background provides context.  Among the major reasons why Alaskans sought statehood was that federal regulation of territorial waters allowed non-Alaskan commercial firms to take salmon in "fish traps," which starved local Alaskans of the catch and threatened the salmon runs.[116]  In 1948, outside salmon packing companies owned 383 of the 429 fish traps licensed in Alaska.[117]  Alaskans twice voted overwhelmingly to eliminate fish traps, but these

---

[116] Gerald E. Bowkett, Reaching for a Star 12 (1989) ("If there were one symbol of the economic discrimination Alaskan's sought to end through statehood it was the salmon trap, a highly efficient means of catching fish controlled primarily by the big absentee canning interests.").

[117] *Id.* at 74.

pre-statehood votes meant nothing because Alaska and its people then had no power to regulate fisheries.[118]  One of the first acts of the Alaska Constitutional Convention in 1955 was to adopt an ordinance prohibiting fish traps, to be submitted to voters for approval along with the state constitution.[119]  Between 1936 and 1959, when federal management of Alaska's salmon finally ended, production had fallen from 8.5 million cases annually to 1.8 million cases.[120]

Ernest Gruening, former governor of and United States senator from Alaska, opposed the establishment of a federal Arctic Wildlife Range because of federal mismanagement of fish and game:

> I opposed the bill because it seemed to me unthinkable that after the Interior Department's failure in the management and conservation of Alaska's fishery and wildlife resources, the new state, which had set up its own far-more-qualified fish and wildlife organization and had offered to make this

---

[118] *Id.*

[119] *Id.* at 74–76; Alaska Const. Ord. 3, § 2 ("As a matter of immediate public necessity, to relieve economic distress among individual fishermen and those dependant upon them for a livelihood, to conserve the rapidly dwindling supply of salmon in Alaska, to insure fair competition among those engaged in commercial fishing, and to make manifest the will of the people of Alaska, *the use of fish traps for the taking of salmon for commercial purposes is hereby prohibited* in all the coastal waters of the State.") (emphasis added).

[120] Bowkett, Reaching for a Star, at 12.

range a state-managed project, should be asked to turn it back to that discredited federal control.[121]

Modern efforts at federal regulation, including ANILCA's rural subsistence priority, remain intensely controversial within Alaska.

As a result of this long-running federal-state controversy, ANILCA imposes negotiated limits on how certain natural resources are managed in Alaska. While ANILCA emphasizes the importance of "subsistence uses" of fish and wildlife and gives them a priority "on public lands," it limits the priority to *rural* subsistence uses, to certain (but not all) public lands, and to federal lands. Moreover, lands owned by the United States but subject to valid State and Native corporation land selections are excluded from the definition of public lands.[122] The priority for "subsistence uses by rural residents of Alaska, including both Natives and non-Natives,"[123] applies only on the specified subset of federal lands.[124] State, Native corporation, and private lands are expressly excluded from the rural subsistence preference regulations.[125]

---

[121] Ernest Gruening, Many Battles 426 (1973).

[122] 16 U.S.C. § 3102(3).

[123] *Id.* § 3111(1).

[124] *See id.* §§ 3102(2)–(3), 3114.

[125] *Id.* § 3103(c).

Furthermore, ANILCA establishes an elaborate scheme for cooperation with state fish and game authorities in managing the rural subsistence priority and limits federal authority even for protecting that priority.[126]   Congress prohibits any construction of the statute "granting any property right in any fish or wildlife," or "enlarging or diminishing the Secretary's authority to manipulate habitat" on the public lands, or restricting the taking of fish or wildlife on the federal lands for nonsubsistence uses "unless necessary for the conservation of healthy populations of fish and wildlife [or] to continue subsistence uses of such populations."[127]

### b.  The primary purposes of ANILCA and other federal reservations in Alaska

"From the 1780s, when the Articles of Confederation government enacted the Northwest Ordinance and its predecessors, to 1986, when the Homestead Act repeal became effective in Alaska, national policy on federally owned lands was to sell them cheap or give them away, rather than to hold on to them or charter them to great companies as England and Spain had."[128]

> With so liberal a policy of giving away the public domain, the government needed a means to mark out some portions that would

---

[126] *Id.* §§  3113–3115, 3202(a).

[127] *Id.* § 3125(1)–(3).

[128] *Coeur D'Alene Tribe of Idaho*, 384 F.3d at 697 (Kleinfeld, J., dissenting).

not be turned into farms, mines, homesites, trade sites, and all the other categories of private ownership. Under the Northwest Ordinance and its Jeffersonian predecessor, land was to be reserved from sale (giving away land for free was Lincoln's subsequent innovation under the Homestead Act) for such purposes as schools and transfer to Revolutionary War veterans. Likewise, under the Morrill Land-Grant Act of 1862, lands were reserved from entry for various public purposes, such as schools. Beginning in 1872 with Yellowstone, reservations from entry were made for parks.[129]

Homesteading ended on October 21, 1976, when Congress enacted the Federal Land Policy and Management Act of 1976. "On that day, all homestead laws were repealed nationwide, however, a 10-year extension was allowed in Alaska since it was a new state with fewer settlers. The last time anyone could file any type of [federal] homestead claim in Alaska was on October 20, 1986. After that day, no more new homesteading was allowed on federal land in Alaska."[130] Many of Alaska's federal reservations are military reservations, such as 607,800 acres near Fairbanks for a

---

[129] *Id.* at 698 (footnotes omitted). Homesteaders usually were required to pay $1.25 per acre, a price that was reduced substantially if the land was not particularly desirable. *See* http://www.archives.gov/education/lessons/homestead-act (last visited June 26, 2013).

[130] Bureau of Land Management, Homesteading Frequently Asked Questions, *available at* http://www.blm.gov/ak/st/en/prog/culture/ak_history/homesteading/homesteading_Q_and_A.html#6 (last visited June 26, 2013).

missile-testing range.[131]   In 1980, ANILCA designated approximately 105 million acres in Alaska as permanently protected federal lands, for various purposes generally associated with wilderness preservation.[132]

Indeed, by and large the reservations ANILCA established are not for use by any people who might need the water itself in competition with other users.  These lands generally were reserved *from* people (other than subsistence users) who might want to live there, not *for* them.  For example, ANILCA sets up seventeen new units within the National Park System and expands three others, and lists the "purposes" for each reservation.[133]   In seventeen of these twenty reservations, none of the "purposes" include human subsistence, and only in three is the protection of "the viability of subsistence resources" mentioned as one among several purposes.[134]   For example, the Aniakchak National Monument is reserved to maintain volcanic features and study the flora and fauna, and to protect habitat for wildlife.[135]   The

---

[131] Ernest Gruening, Many Battles 418 (1973); *see also United States v. N. Am. Transp. & Trading Co.*, 253 U.S. 330 (1920) (reservation of land near Nome for use as an Army post).

[132] *Se. Alaska Conservation Council, Inc. v. Watson*, 697 F.2d 1305, 1307 (9th Cir. 1983).

[133] *See generally* 16 U.S.C. §§ 410hh–410hh-1.

[134] *See id.* § 410hh(2)–(3), (6).  ANILCA states that "subsistence uses by local residents shall be permitted" in several reservations, but that is far different from saying that subsistence use is a reason why the reservations were created.  *See id.* §§ 410hh(1), (3), (4)(a), (6), (7)(b), (9), 410hh-1(3)(a).

[135] *Id.* § 410hh(1).

Cape Krusenstern National Monument is established for archeological study and to preserve habitat for wildlife.[136] The 6.5 million-acre Noatak National Preserve has as among its purposes maintaining the river "unimpaired by adverse human activity."[137]  The purpose of the 567,000-acre Kenai Fjords National Park is "[t]o maintain unimpaired the scenic and environmental integrity of the Harding Icefield, its outflowing glaciers, and coastal fjords and islands in their natural state; and to protect seals, sea lions, other marine mammals, and marine and other birds and to maintain their hauling and breeding areas in their natural state, *free of human activity* which is disruptive to their natural processes."[138]  The Secretaries' 1999 Rule includes additional reservations that also are not primarily designed for the purpose of furthering subsistence hunting or fishing.

However, because quite a few people, Native and non-Native, already did live on the vast newly reserved lands, or hunted or fished there for their subsistence, ANILCA was shaped to preserve their interest in subsistence living from the new federal restrictions.  Accordingly, Congress preserved subsistence use in many of the reservations, even though none of the reservations listed such use as their primary purpose and most did not list subsistence use among their purposes at all. The crucial point is that human use for subsistence on most federal reservations in Alaska is a servitude imposed as

---

[136] *Id.* § 410hh(3).

[137] *Id.* § 410hh(8)(a).

[138] *Id.* § 410hh(5) (emphasis added).

a limitation on federal control, rather than a specified purpose for which the federal reservation was established.[139]

Indeed, not only are the ANILCA and other federal reservations not established for human use of the water in the streams, but most of time, at least in the northern half of the state, the water is not even "water" in the sense of being a liquid.  It is ice.  No one can drink it without making a hole

---

[139] Perhaps the best example of the tension between the purposes of federal reservations in Alaska—more or less of excluding human activities—and the preservation of rural subsistence rights as a kind of servitude is the case of Alex Sando Tarnai.  Tarnai was a trapper who had fled Hungary after the unsuccessful 1956 uprising, and who built his cabin on the Nowitna River in 1977.  David Hullen, *Trapper, government wage strange battle*, Anchorage Daily News, Nov. 19, 1989, at A1.  In 1980, ANILCA established the Nowitna National Wildlife Refuge to "conserve wildlife populations and habitats in their natural diversity."  ANILCA § 302(6), 94 Stat. 2371.  Tarnai was the sole human living in the vast wilderness of the newly created 2.1-million acre refuge, two days' dogsled trip from Ruby, Alaska.

Tarnai was so isolated that he did not learn of ANILCA until two years after it had become law.  When federal officials learned that a woman was planning to visit him for a few weeks at his cabin, they threatened to treat his cabin as a "recreational" rather than a "subsistence" cabin, so that he would be evicted from his home.  Their theory was that if a woman who was not an immediate family member stayed in his cabin, his use of the cabin would become "recreational" rather than "subsistence," and the statute bars permits for "private recreational use" cabins.  *See* 16 U.S.C. § 3193(b)(2).  Tarnai and his guest slept in a tent outside his cabin in minus-twenty-degree weather to avoid a citation.  Tarnai later successfully litigated against the federal government, establishing that his subsistence use for trapping was not defeated by this incidental non-subsistence use, and that even a "subsistence" dweller was entitled to engage in activities in his cabin yielding companionship or pleasure, not just activities sustaining life.  *Tarnai v. Fisher*, No. 87-0068 (D. Alaska dismissed Jan. 21, 1990).

in the ice, and it could not be used for irrigation, if there were anything to irrigate, which by and large there is not.  There are no large farms or ranches, nor great reservoirs serving cities, along the greatest of the waters, the roughly two thousand-mile-long Yukon, nor along most of the other rivers and streams at issue in this litigation.

This observation distinguishes the federal reservations at issue in this case from much of the American West, where water is scarce and where, as in *Winters*, aridity can defeat the purpose of a reservation.  In this case, in contrast, no one is claiming that the water itself must be reserved to fulfill the purposes of the ANILCA reservations.  That is, there is no suggestion that any federal reservation along any Alaskan waters risks being turned into a "barren waste" as in *Winters*, or a substantially diminished pool, as in *Cappaert*, or is in any way short of water.  In this way, Alaska's federal reservations differ dramatically from the reservations in arid regions.

Of course, water must be preserved for the geese and ducks, and if anyone were to drain the many lakes and ponds, the reduction in water quantity would threaten migrating birds.  For example, the Nowitna National Wildlife Refuge, where Alex Tarnai lived, has among its legislatively stated purposes ensuring the necessary water quantity "within the refuge" to conserve its fish and wildlife population, including geese, ducks, moose, pike, salmon, and other wildlife.[140]  The

---

[140] ANILCA § 302(6)(B), 94 Stat. 2371, 2387 (1980) ("The purposes for which the Nowitna National Wildlife Refuge is established and shall be managed include—(i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, trumpeter swans, white-fronted geese, canvasbacks and other waterfowl and

Wrangell-Saint Elias National Park and Preserve seek to protect habitat for "fish and wildlife" such as "trumpeter swans and other waterfowl."[141]  And the Lake Clark National Park and Preserve were created "to protect the watershed necessary for perpetuation of the red salmon fishery in Bristol Bay."[142]  As for the people living in or near these and other ANILCA reservations, the utility of the water is generally as transportation arteries for riverboats, snow machines, and occasionally dog teams, and for fishing.

ANILCA's text and history, as well as the history and realities of rural living in Alaska, thus lead to a critical observation: human use for subsistence on many federal reservations in Alaska, including ANILCA conservation system units, is a servitude imposed as a limitation on federal control, rather than a specified purpose for which most such reservations were established.  For this reason, and because modern federal efforts to regulate natural resources in Alaska remain controversial, ANILCA limits the application of its rural subsistence priority to a carefully delineated subset of federal lands, and establishes an elaborate scheme for

---

migratory birds, moose, caribou, martens, wolverines and other furbearers, salmon, sheefish, and northern pike; (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats; (iii) to provide in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.").

[141] 16 U.S.C. § 410hh(9).

[142] *Id.* § 410hh(7)(a).

cooperation between the Secretaries and State fish and game authorities in managing the rural subsistence priority.

### c.  The constraints of the federal reserved water rights doctrine

Recognizing these constraints in *Katie John I*, we limited federal ANILCA authority over waters outside the boundaries of reservations to federally reserved lands, including "appurtenant waters then unappropriated to the extent necessary to accomplish the purpose of the reservation."[143] That is, we held that the ANILCA rural subsistence priority applied not to all Alaska waters subject to the federal navigational servitude, but only to those "navigable waters in which the United States has reserved water rights."[144] Waters were reserved to the United States only if the United States *intended* to reserve the water.  That intent would be inferred "if those waters are necessary to accomplish the purposes for which the land was reserved."[145]  We noted that the United States had reserved vast lands in Alaska for many different purposes, and left it to the federal agencies to identify the "navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine."[146]  These prior holdings control on the critical questions in this litigation.

---

[143] *Katie John I*, 72 F.3d at 703.

[144] *Id.* at 700.

[145] *Id.* at 703.

[146] *Id.* at 704.

The Katie John plaintiffs would have us extend the rural subsistence priority to all waters upstream and downstream from, and not only adjacent to, federal reservations, on the theory that what happens elsewhere may affect what happens within a reservation.  That broad claim, to federal regulation of a substantial majority of the rivers and streams in Alaska, is unsupported by ANILCA's text and conflicts with *Katie John I* and *Katie John II*.  Our circuit is committed to the position that for the rural subsistence priority to apply to navigable waters outside federal reservations, the waters have to be "appurtenant to" the reservations and so "necessary to accomplish the purposes for which the land was reserved" that "without the water the purposes of the reservation would be entirely defeated."[147]

ANILCA put 105 million acres (162,500 square miles), of Alaska under federal restrictions[148] (beyond the 84.1 million acres (131,406 square miles) already reserved or withdrawn when Alaska attained statehood[149]) for purposes that involve little or no water consumption and many of which have little or nothing to do with human use.  Congress did state at the beginning its intent in ANILCA "to protect the resources related to subsistence needs."[150]  ANILCA provides for "continuation of the opportunity for subsistence uses by rural

---

[147] *Id.* at 703 (quoting *New Mexico*, 438 U.S. at 700).

[148] *Se. Alaska Conservation Council*, 697 F.2d at 1307.

[149] Teresa Hull & Linda Leask, *Dividing Alaska, 1867–2000: Changing Land Ownership and Management*, Alaska Review of Social & Economic Conditions, Volume XXXII, 6 tbl. 1 (2000).

[150] 16 U.S.C. § 3101(b).

residents of Alaska"[151] to avoid disrupting and destroying the human uses already being made, but the Supreme Court held in *Amoco Production Co. v. Village of Gambell*[152] that ANILCA does not make subsistence uses more important than other uses of federal lands. Rather, ANILCA simply recognizes subsistence uses as "*a* public interest" within a statutory "framework for reconciliation, where possible, of competing public interests."[153] Similarly, the additional (non-ANILCA) federal reservations listed in the 1999 Rules were not primarily withdrawn for the stated purpose of furthering subsistence fishing or hunting.[154] As explained above, human subsistence needs are imposed on all of these reservations as a kind of servitude, so that ANILCA does not destroy the preexisting way of life on those federal lands. But it is untenable to reason that upstream and downstream waters are necessarily included in the priority granted to subsistence uses on those reservations, particularly when subsistence uses are not among the primary purposes listed in the statutory sections establishing most of the reserves.

Again, water rights may be essential to a purpose of the reservation other than subsistence. Were non-federal activities, such as a dam or diversion of a river where salmon spawn, or drying up of lakes and ponds that migrating geese use, to threaten the purposes of a federal reservation, ANILCA's rural subsistence priority might come into play as

---

[151] 16 U.S.C. § 3111(1).

[152] *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987).

[153] *Id.* at 545–46.

[154] The National Petroleum Reserve in Alaska was established for exploration of petroleum reserves. *See* 42 U.S.C. § 6504.

a result of an enforcement action particularized to the particular purposes of a particular reservation. But no such activity is before us. This is not a particularized enforcement action, and the Katie John plaintiffs do not ask us or the Secretaries to consider the actual purposes of any of the reservations. Instead, they seek a generalized declaratory judgment "that reserved waters extend upstream and downstream of" all the federal reservations listed in the 1999 Rules.[155]

Such relief we cannot grant. We cannot conclude that the Secretaries acted arbitrarily, capriciously, or contrary to law in declining to include upstream and downstream waters as currently within a reserved right for purposes of a rural subsistence priority, when subsistence uses in many cases were not specified as primary purposes of the reservations. The Katie John plaintiffs' demand would require us to ignore the central role those purposes play in applying the federal reserved water rights doctrine, and to make up out of nothing a notion that all federal reservations in Alaska require all upstream and downstream waters for purposes we or the plaintiffs, not Congress, claim. Such a holding would be inconsistent with the Supreme Court's decision in *New Mexico*, under which reserved water rights exist to serve only the primary purposes of a federal reservation,[156] and with ANILCA, which simply "does not support such a complete assertion of federal control."[157]

---

[155] We note, as do the Secretaries, that there is no shortage of waters to serve the primary purposes of the reservations.

[156] *See* 438 U.S. at 708, 713–15.

[157] *Katie John I*, 72 F.3d at 704.

If any of the various reservations ever do run short of the water necessary to maintain subsistence uses, the United States may or may not be entitled to that water under the federal reserved water rights doctrine, a fact the Secretaries acknowledge.  But "[w]here water is only valuable for a secondary use of the reservation," the United States must acquire the water "in the same manner as any other public or private appropriator."[158]   No claims particularized to any federal reservation and its need for water are made in the complaint in this case.

In short, we agree with the district court that the Secretaries reasonably determined that, as a general matter, federally reserved water rights may be enforced to implement ANILCA's rural subsistence priority as to waters within and "immediately adjacent to" federal reservations, but not as to waters upstream and downstream from those reservations. We also agree with the district court that the federal reserved water rights doctrine might apply upstream and downstream from reservations in some circumstances, were there a particularized enforcement action for that quantity of water needed to preserve subsistence use in a given reservation, where such use is a primary purpose for which the reservation was established.  But the abstract claim that all upstream and downstream waters are necessary for all the federal reservations in the 1999 Rules cannot withstand ANILCA's text or history, the joint decision of the two cabinet secretaries to whom administration of the complex statute has been delegated, our decisions in *Katie John I* and *Katie John II*, or the facts established in this litigation.

---

[158] *New Mexico*, 438 U.S. at 702.

### 4.  Alaska Native Allotments

The Alaska Native Allotment Act of 1906[159] authorized the Secretary of the Interior to allot "to any Indian, Aleut, or Eskimo" a 160-acre allotment of unsurveyed or otherwise unappropriated land upon proof of "substantially continuous use and occupancy" of the land for five years.[160]  The Alaska Native Claims Settlement Act of 1971[161] repealed the 1906 Act but did not extinguish existing allotments or allotments under application at the time of the repeal.[162]  Alaska Natives who have been granted allotments own the lands conveyed to them in restricted fee.  The allotments are non-taxable unless authorized by Congress, and they cannot be conveyed without approval from the Secretary of the Interior.[163]

The Secretaries did not include within "public lands" the waters appurtenant to Alaska Native allotments falling outside the land units listed in the 1999 Rules.[164]  Rather, the

---

[159] Pub. L. 59-171, 34 Stat. 197 (1906, as amended) (codified at 43 U.S.C. §§ 270-1 through 270-3 (1970)).  The original Act did not include Aleuts, or require five years of substantially continuous use.

[160] Id.

[161] Pub. L. 92-203, 85 Stat. 688 (1971, as amended) (codified at 43 U.S.C. §§ 1601–1629h).

[162] 43 U.S.C. § 1617(a).

[163] 43 C.F.R. § 2561.3 (2006).

[164] Some allotments granted pursuant to the Alaska Native Allotment Act are within the boundaries of the conservation system units and forest reserves identified in the 1999 Rules.  See 64 Fed. Reg. at 1,279.  These allotments are already subject to ANILCA's rural subsistence priority.  Id.

1999 Rules delegate to the Federal Subsistence Board the authority to

> [i]dentify, in appropriate specific instances, whether there exists additional Federal reservations, Federal reserved water rights or other Federal interests in lands or waters, including those in which the United States holds less than a fee ownership, to which the Federal subsistence priority attaches, and make appropriate recommendation to the Secretaries for inclusion of those interests within the Federal Subsistence Management Program.[165]

Thus, the Federal Subsistence Board has the authority to make recommendations to the Secretaries for additions, if necessary, to the waters that are "public lands" by virtue of the federal reserved water rights doctrine, including waters appurtenant to the Alaska Native allotments.

The Secretaries concede that the United States has consistently asserted an interest in Native American allotments by virtue of their restricted fee status. The Secretaries also recognize that, typically, "allotments of Indian reservations to individual Indians, as well as the transfer of these allotments to non-Indians, have been found to carry with them a share of the reservation's [federal reserved water rights] pursuant to section 7 of the General

---

[165] *Id.* at 1,290 (codified at 36 C.F.R. § 242.10(d)(4)(xix) and 50 C.F.R. § 100.10(d)(4)(xix)).

Allotment Act, 25 U.S.C. § 381."[166]  Although the Secretaries do not take the position that federal reserved water rights do not or cannot reach the waters appurtenant to Alaska Native allotments, they argue that the allotments are "unique" and that the "complex legal issues surrounding the question" led them to conclude that identification of which waters appurtenant to these allotments should be included within "public lands" was best done on a case-by-case basis.

The State argues that the Alaska Native allotments do not give rise to federal reserved water rights at all.  The State reasons that, "[u]nlike the allotments [created under the General Allotment Act], Alaska Native allotments are not derived from a previous Indian reservation and, therefore, cannot succeed to any *Winters* water rights associated with an Indian reservation."  In other words, federal reserved water rights emerge only out of federal reservations; they do not attach to Alaska Native allotments created from the public domain.

For their part, the Katie John plaintiffs challenge the Secretaries' decision not to categorically designate as "public lands" subject to ANILCA's rural subsistence priority the waters appurtenant to all Alaska Native allotments.  The Katie John plaintiffs argue that the United States has an interest in the allotments by virtue of their restricted fee status, and that water is necessary to carry out the subsistence purposes for which these allotments were created.

---

[166] *See, e.g.*, *United States v. Powers*, 305 U.S. 527, 532 (1939); *Walton*, 647 F.2d at 50 ("It is settled that Indian allottees have a right to use reserved water.")

We need not decide whether Alaska Native allotments can give rise to federal reserved water rights. The Secretaries reasonably decided to resolve this difficult issue on a case-by-case basis. We uphold the 1999 Rules, and affirm the district court's conclusion that it was "lawful and reasonable" for the Secretaries to delegate authority to the Federal Subsistence Board to decide which Native allotments falling outside of federal reservations, if any, give rise to federal reserved water rights which justify imposing ANILCA's rural subsistence priority on appurtenant waters.

Determining which waters within or appurtenant to each allotment may be necessary to fulfill the allotment's needs is a complicated and fact-intensive endeavor that is best left in the first instance to the Secretaries, not the courts. We are mindful that *Katie John I* expresses the hope that the federal agencies will "determine promptly which navigable waters are public lands subject to federal subsistence management,"[167] and that the parties to this litigation have an interest in a final determination of how the Secretaries will manage ANILCA's rural subsistence priority. Accordingly, while we defer to the Secretaries' determination in the 1999 Rules regarding how best to identify federal reserved water rights for Alaska Native settlement allotments, we encourage them to undertake that process in a reasonably efficient manner.

### 5. Selected-but-not-yet-conveyed lands

The final disputed issue is not about water rights, but rather about certain lands on which the Secretaries have chosen to apply ANILCA's rural subsistence priority. These

---

[167] *Katie John I*, 72 F.3d at 704.

lands—known as "selected-but-not-yet-conveyed" lands—are federal lands that have been selected by the State or an Alaska Native corporation for conveyance, but have not yet been formally conveyed from the United States to Alaska or the corporation.

Section 102 of ANILCA expressly excludes selected-but-not-yet-conveyed lands from the definition of "public lands."[168]  For this reason the State argues that the Secretaries' decision to administer them according to the rural subsistence priority was unlawful.  But it is not so simple.  Section 906(o)(2) of ANILCA, located in Title IX of the statute, provides a competing directive: "Until conveyed, all Federal lands within the boundaries of a conservation system unit, National Recreation Area, National Conservation Area, new national forest or forest addition, shall be administered in accordance with the laws applicable to such unit."[169]  Because ANILCA does not define "Federal land" for purposes of § 906(o)(2),[170] we give that term its ordinary

---

[168] 16 U.S.C. § 3102(3)(A) (excluding from the definition of public lands "land selections of the State of Alaska which have been tentatively approved or validly selected under the Alaska Statehood Act and lands which have been confirmed to, validly selected by, or granted to the Territory of Alaska or the State under any other provision of Federal law"); *id.* § 3102(3)(B) (excluding from the definition of public lands "land selections of a Native Corporation made under the Alaska Native Claims Settlement Act [43 U.S.C.A. § 1601 et seq.] which have not been conveyed to a Native Corporation, unless any such selection is determined to be invalid or is relinquished").

[169] 43 U.S.C. § 1635(o)(2).

[170] 16 U.S.C. § 3102 states that "in titles IX and XIV the following terms shall have the same meaning as they have in the Alaska Native Claims Settlement Act, and the Alaska Statehood Act."  We are not aware of any

meaning, *i.e.*, "[l]and owned by the United States government."[171]   The record in this case shows that title to selected-but-not-yet-conveyed lands remains with the United States.

Accordingly, in administering ANILCA's rural subsistence priority, the Secretaries faced inconsistent obligations.   On one hand, selected-but-not-yet-conveyed lands are not "public lands" subject to the rural subsistence priority.   On the other hand, these lands are "Federal lands," which, under § 906(o)(2), "shall be administered in accordance with the laws applicable to" the federal reservation that they are within.   ANILCA therefore is ambiguous regarding whether selected-but-not-yet-conveyed lands "within the boundaries of a conservation system unit, National Recreation Area, National Conservation Area, new national forest or forest addition" are subject to rural subsistence priority management, and we must decide whether the Secretaries' decision—that they are so subject—is a permissible interpretation of the statute.[172]

---

definition of "Federal land" in the Alaska Native Claims Settlement Act, *see* 43 U.S.C. § 1602, or the Alaska Statehood Act, *see* Pub. L. 85-508, 72 Stat. 339 (1958).

[171] Black's Law Dictionary 893 (8th ed. 2004).

[172] *Chevron*, 467 U.S. at 842–43.   The district court, in upholding the Secretaries' decision to apply ANILCA's subsistence priority to selected-but-not-yet-conveyed lands, reasoned that the provision in ANILCA § 804, 16 U.S.C. § 3114, that the subsistence priority applies "[e]xcept as otherwise provided in this Act and other Federal laws" cures any conflict between §§ 102 and 906, and supports the Secretaries' decision to apply the priority to selected-but-not-yet-conveyed lands.   We are not so sanguine.   Read in the context of § 804, "[e]xcept as otherwise provided" is most naturally read to *limit* the application of the rural subsistence

The Secretaries argue that they resolved this inherent conflict in favor of § 906(o)(2) because to do otherwise would make all laws *except* Title VIII of ANILCA applicable to the selected-but-not-yet-conveyed lands within the boundaries of the conservation system units.  Admittedly, by resolving the conflict in this manner, the Secretaries are extending rural subsistence priority beyond "public lands." But their position is reasonable.  To hold that the selected-but-not-yet-conveyed lands are subject to the same laws as the surrounding areas *except* rural subsistence priority management would require the Secretaries to carve out small geographic sections from the larger federal land units and then administer the rural subsistence priority on all lands *but* these sections.  Such a regime would be unmanageable and contrary to the intent of § 906(o)(2).  Furthermore, because the title to the selected-but-not-yet-conveyed land remains with the United States, there is no practical reason to exclude these lands from federal rural subsistence priority management before they are formally conveyed to the State or a Native corporation.  For these reasons, the Secretaries' reconciliation of conflicting provisions in favor of § 906(o)(2) was a permissible construction of an ambiguous statute.

## CONCLUSION

In reaching our decision, we recognize that we and the Secretaries have been working with imperfect tools.  *Katie John I* was a problematic solution to a complex problem, in that it sanctioned the use of a doctrine ill-fitted to determining which Alaskan waters are "public lands" to be managed for

---

priority, indicating that there may be instances in which even "public lands" are not subject to subsistence management.

rural subsistence priority under ANILCA.  But *Katie John I* remains the law of this circuit, and we, like the Secretaries, must apply it as best we can.

We conclude that, in the 1999 Rules, the Secretaries have applied *Katie John I* and the federal reserved water rights doctrine in a principled manner.  It was reasonable for the Secretaries to decide that: the "public lands" subject to ANILCA's rural subsistence priority include the waters within and adjacent to federal reservations; and reserved water rights for Alaska Native Settlement allotments are best determined on a case-by-case basis.

**AFFIRMED**.