**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOHN STURGEON,
*Plaintiff-Appellant*,

v.

HERBERT FROST, in his official capacity as Alaska Regional Director of the National Park Service; GREG DUDGEON; ANDEE SEARS; RYAN ZINKE, Secretary of the Interior; MICHAEL REYNOLDS, in his official capacity as Acting Director of the National Park Service; THE NATIONAL PARK SERVICE; THE UNITED STATES DEPARTMENT OF THE INTERIOR,
*Defendants-Appellees*.

No. 13-36165

D.C. No.
3:11-cv-00183-HRH

OPINION

On Remand from the United States Supreme Court

Argued and Submitted October 25, 2016
Seattle, Washington

Filed October 2, 2017

Before:  Jerome Farris, Dorothy W. Nelson, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen;
Concurrence by Judge Nguyen

## SUMMARY[*]

**Alaska National Interest Lands Conservation Act**

The panel affirmed the district court's summary judgment in favor of federal defendants, and held, on remand from the Supreme Court, that the federal government properly exercised its authority to regulate hovercraft use on the rivers within conservation system units in Alaska.

The Yukon-Charley National Preserve conservation system unit was set aside for preservation purposes by the Alaska National Interest Lands Conservation Act ("ANILCA").  Within the borders of Yukon-Charley was a stretch of the Nation River which plaintiff sought to travel by hovercraft to get to moose hunting grounds.  Plaintiff contended that the Nation River belonged to Alaska, which permits hovercraft on its waterways, and that the National Park Service had no authority to regulate, and prohibit, the use of hovercraft on that stretch of the river.

The panel held that ANILCA section 103(c) did not limit the Park Service from applying the hovercraft ban on the

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Nation River in the Yukon-Charley preserve. The panel held that under the *Katie John* precedent – *Alaska v. Babbitt*, 72 F.3d 698 (9th Cir. 1995) (*Katie John I*), *John v. United States*, 247 F.3d 1032 (9th Cir. 2001) (en banc) (*Katie John II*), and *John v. United States*, 720 F.3d 1214 (9th Cir. 2013) (*Katie John III*) – the United States had an implied reservation of water rights, rendering the river public lands. On remand from the United States Supreme Court, the panel again concluded that the federal government properly regulated hovercraft use on the Nation River in the Yukon-Charley preserve.

Judge Nguyen also separately concurred, joined by Judge D.W. Nelson. Judge Nguyen acknowledged that the panel was bound by case law to analyze this case under the reserved water doctrine, but she would conclude that this case is better analyzed under the Commerce Clause as it is about the right to regulate navigation on navigable waters within an Alaska national preserve.

## COUNSEL

Matthew Todd Findley (argued) and Eva R. Gardner, Ashburn & Mason P.C., Anchorage, Alaska; Douglas Pope, Pope & Katcher, Anchorage, Alaska; for Plaintiff-Appellant.

Elizabeth Ann Peterson (argued), Vivian H.W. Wang, Dean K. Dunsmore, David C. Shilton, and Andrew C. Mergen, Attorneys; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; F. Christopher Bockmon and Joseph P. Darnell, Office of the Solicitor, United States Department of the Interior, Anchorage, Alaska; Jason Waanders, Office of the Solicitor,

United States Department of the Interior, Philadelphia, Pennsylvania; for Defendants-Appellees.

Ruth Botstein (argued), Assistant Attorney General; Jahna Lindemuth, Attorney General; State of Alaska Department of Law, Anchorage, Alaska; Janell M. Hafner, Assistant Attorney General, State of Alaska Department of Law, Juneau, Alaska; for Amicus Curiae State of Alaska.

Heather R. Kendall Miller and Matthew N. Newman, Native American Rights Fund, Anchorage, Alaska; Robert T. Anderson, University of Washington School of Law, Seattle, Washington; Lloyd B. Miller, Sonosky Chambers Sachse Miller & Munson, Anchorage, Alaska; Riyaz A. Kanji, Kanji & Katzen PLLC, Ann Arbor, Michigan; for Amici Curiae Mentasta Traditional Council, Village of Dot Lake, Tanana Chiefs Conference, Kenaitze Indian Tribe, Organized Village of Saxman, and Chugachmiut and Nora David.

James D. Linxwiler and Josh Van Gorkom, Guess & Rudd P.C., Anchorage, Alaska, for Amici Curiae Ahtna, Inc.; Aleut Corp.; Bristol Bay Native Corp.; Calista Corp.; Doyon, Ltd.; Nana Regional Corp.; Gana-A' Yoo, Ltd.; and Tihteet' Aii, Inc.

Katherine Strong and Valerie Brown, Trustees for Alaska, Anchorage, Alaska; Thomas E. Meacham, Anchorage, Alaska; Donald B. Ayer, Jones Day, Washington, D.C.; for Amici Curiae National Parks Conservation Association, Defenders of Wildlife, Wilderness Society, American Rivers, Center for Biological Diversity, Sierra Club, Wilderness Watch, Denali Citizens Council, Copper Country Alliance, Alaska Quiet Rights Coalition, Northern Alaska Environmental Center, Friends of Alaska National Wildlife Refuges, and Alaska Wilderness League.

**OPINION**

NGUYEN, Circuit Judge:

John Sturgeon would like to use his hovercraft in a national preserve to reach moose hunting grounds. The State of Alaska is fine with that;[1] the federal government is not. Sturgeon's case turns on which entity—state or federal—gets to decide the matter. On remand from the Supreme Court, we again conclude that the federal government properly exercised its authority to regulate hovercraft use on the rivers within conservation system units in Alaska.

## I.

### A.

The Yukon-Charley Rivers National Preserve conservation system unit ("Yukon-Charley") is among the 104 million acres of land in Alaska set aside for preservation purposes by the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3101 *et seq.* (1980). Like other conservation system units created by

---

[1] The State of Alaska was previously a party to the litigation in the district court and in this court. In our prior opinion, we held that Alaska lacked standing, vacated the district court's judgment as to the State, and remanded with instructions to dismiss the State for lack of jurisdiction. *Sturgeon v. Masica*, 768 F.3d 1066, 1075 (9th Cir. 2014). Alaska did not seek Supreme Court review of that holding, and the district court amended its judgment to dismiss Alaska for lack of jurisdiction. That judgment being final, it is unaffected by the Supreme Court's vacatur of our prior opinion, *Sturgeon v. Frost*, 136 S. Ct. 1061 (2016). We have considered Alaska's supplemental briefing along with that submitted by the other amici curiae and the remaining parties.

ANILCA, Yukon-Charley was drawn around a mix of federal, state, Native Corporation, and private owners.

Within the boundaries of the Yukon-Charley lies a stretch of the Nation River. Sturgeon would like to travel by hovercraft on this part of the river to get to moose hunting grounds located upstream from the preserve. Park Service regulations prohibit the use of hovercraft within "[w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System . . . without regard to the ownership of submerged lands, tidelands, or lowlands." 36 C.F.R. § 1.2(a)(3); *see id.* § 2.17(e). Alaska permits hovercraft on its waterways. Sturgeon contends that the Nation River belongs to Alaska and that the Park Service has no authority to regulate it. He seeks declaratory and injunctive relief preventing the Park Service from enforcing its hovercraft ban.

**B.**

ANILCA balanced the need to protect "the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska" with the need to provide "adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." 16 U.S.C. § 3101(d). Thus, while ANILCA provided that conservation system units in Alaska generally "shall be administered . . . under the laws governing the administration of [National Park Service system unit] lands," *id.* § 410hh, it "specified that the Park Service could not prohibit on those lands certain activities of particular importance to Alaskans." *Sturgeon v. Frost*, 136 S. Ct. 1061, 1066 (2016). For example, Park Service regulations applicable nationwide prohibit hunting and snowmobiling for the most part, *see* 36 C.F.R. §§ 2.2, 2.18, whereas ANILCA permits, subject to reasonable regulations, "the use

of snowmachines . . . for travel to and from villages and homesites," 16 U.S.C. § 3170(a), and "the taking of . . . wildlife for sport purposes and subsistence uses," *id.* § 3201.

## II.

"Section 103(c) of ANILCA . . . addresses the scope of the Park Service's authority over lands within the boundaries of conservation system units in Alaska." *Sturgeon*, 136 S. Ct. at 1067. It provides as follows:

> Only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit. *No lands which, before, on, or after December 2, 1980, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units.* If the State, a Native Corporation, or other owner desires to convey any such lands, the Secretary may acquire such lands in accordance with applicable law (including this Act), and any such lands shall become part of the unit, and be administered accordingly.

16 U.S.C. § 3103(c) (emphasis added). The parties dispute the meaning of section 103(c) and in particular what it means to "be subject to the regulations applicable solely to public lands within such units."

The key to understanding section 103(c) is the difference between "Federal lands" and "public lands." ANILCA defines "public lands" as "land situated in Alaska which,

after December 2, 1980, are Federal lands" except for land selected by the State of Alaska or a Native Corporation the title to which has not yet been conveyed. *Id.* § 3102(3). Similarly, "Federal land" is defined as "lands the title to which is in the United States after December 2, 1980." *Id.* § 3102(2). Simply put, Federal lands include land selections made by Alaska and Native Corporations but not yet transferred to them. Public lands do not. These land selections, while still formally belonging to the federal government, are not to be regulated as part of conservation system units.

The first sentence of section 103(c) establishes that the land selections by Alaska and Native Corporations are not "deemed to be included as a portion of such unit[s]" because that distinction belongs "[o]nly" to "public lands." Both the first and third sentences refer to public lands as being "a portion of" or "part of" the conservation system units in Alaska. This is distinct from lands that are merely "within such units," a phrase used in the second sentence as shorthand for lands "within the boundaries of" such units but not necessarily a part of them. Land "within such units" includes public lands, the land selections, and non-federal lands. *See, e.g.*, Solid Waste Sites in Units of the National Park System, 59 Fed. Reg. 65,948, 65,949 (Dec. 22, 1994) ("[T]he phrase 'within the boundaries' is commonly employed to refer to both Federal land and nonfederally owned land or interests in land within the outer boundaries [of] a [National Park System] unit.").

The confusion in the second sentence stems from the awkward placement of "within such units." The phrase is not modified by "solely." *See Sturgeon*, 136 S. Ct. at 1070. Rather, it modifies "applicable." Thus, "regulations applicable solely to public lands within such units" means

regulations applicable within such units solely to *public* lands—as opposed to *Federal* lands. In other words: regulations that apply only to lands that are deemed part of the units themselves. Outside Alaska, all federally owned lands within conservation system units are deemed part of the unit. *See* 54 U.S.C. § 100501. "Alaska is different." *Sturgeon*, 136 S. Ct. at 1070.

The import of the second sentence is that Federal lands within conservation system units that have been transferred to a non-federal party—like Federal lands that have been selected for state or tribal use—are not "subject to" regulations specific to the conservation system units.[2] Regulations applicable solely to public lands include Park Service regulations applicable nationwide and Alaska-specific regulations found in ANILCA.[3] These contrast with regulations of general applicability, such as the Clean Air

---

[2] We previously upheld as reasonable an agency determination that certain regulations specific to Alaska units applied to land selections as well as Federal lands. *See John v. United States* (*Katie John III*), 720 F.3d 1214, 1244–45 (9th Cir. 2013) (construing 36 C.F.R. § 242.4(2)). The basis for this holding was the apparently "inconsistent" directive in section 906(o)(2) of ANILCA: "Until conveyed, all Federal lands within the boundaries of a conservation system unit . . . shall be administered in accordance with the laws applicable to such unit." 43 U.S.C. § 1635(o)(2). Subsection (o), however, concerns land withdrawals—not land selections—and it expressly does not apply to those subsections of § 1635 pertaining to land selections. *See id.* § 1635(o)(1). Regardless, *Katie John III* acknowledged that "[s]ection 102 of ANILCA expressly excludes selected-but-not-yet-conveyed lands from the definition of 'public lands.'" *Katie John III*, 720 F.3d at 1243.

[3] Of course, Park Service regulations applicable to conservation system units nationwide may be modified by Alaska-specific regulations. *See* 36 C.F.R. § 13.2(a).

Act, that also affect non-public lands located within such units, such as the land selections and private lands.

Section 103(c) directly responds to the controversy that "Congress . . . stepped in to settle" when it enacted ANILCA. *Sturgeon*, 136 S. Ct. at 1066. Many Alaskans "were concerned that . . . new monuments [designated by President Carter] would be subject to restrictive federal regulations." *Id.* at 1065–66. By exempting Federal lands selected for state or tribal use from being regulated as a part of the unit, ANILCA serves one of its stated goals of providing "adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." 16 U.S.C. § 3101(d).

Of course, regulation by the Park Service serves ANILCA's other goal of providing "sufficient protection for the national interest in the scenic, natural, cultural and environmental values." *Id.* But that goal is expressly limited to "public lands" in Alaska. *Id.* Land that is transferred to or selected for non-federal entities is generally not subject to the regulation of conservation system units. However, non-public land is still subject to such regulation if the United States retains an interest in it because the land is public to the extent of the interest.[4] That is clear from ANILCA's definition of "land" as "lands, waters, *and interests therein*." *Id.* § 3102(1) (emphasis added).

---

[4] The parties disagree about the Park Service's authority to regulate lands to and in which the United States has no title or interest by enacting regulations that apply to public and non-public land alike. We need not decide whether such a regulation would be enforceable on non-public land on the ground that it is not "applicable solely to public lands." 16 U.S.C. § 3103(c).

ANILCA recognizes that the federal government retains an interest in at least some otherwise non-public lands. It directs the Secretary of the Interior to "develop and transmit to . . . Congress a conservation and management plan for each of the units of the National Park System established or [expanded] by [ANILCA]." *Id.* § 3191(a). One component of the plan is a description of any privately-owned areas within the unit, their purposes, the actual or anticipated activities in the privately-owned areas, the effects of such activities on the unit, and "methods (such as cooperative agreements and *issuance or enforcement of regulations*) of controlling the use of such activities to carry out the policies of [ANILCA] and the purposes for which such unit is established or expanded." *Id.* § 3191(b)(7)(E) (emphasis added). Congress plainly expected that the Park Service could issue regulations governing conservation system units that would affect privately-owned lands.

## III.

The hovercraft ban "do[es] not apply on non-federally owned lands and waters . . . located within National Park System boundaries," 36 C.F.R. § 1.2(b), except, as relevant here, on "[w]aters subject to the jurisdiction of the United States," *id.* § 1.2(a)(3), and on "[o]ther . . . waters over which the United States holds a less-than-fee interest, to the extent necessary to fulfill the purpose of the National Park Service administered interest and compatible with the nonfederal interest," *id.* § 1.2(a)(5). The question is whether the Nation River is subject to the jurisdiction or an interest of the United States such that it is public land that the Park Service is authorized to regulate.

## A.

Before Alaska gained statehood, the Submerged Lands Act "release[d] and relinquishe[d] unto [the] States . . . all right, title, and interest of the United States" to "the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters." 43 U.S.C. § 1311(a)–(b). The Alaska Statehood Act secured these rights for Alaska. Pub. L. No. 85-508, § 6(m), 72 Stat. 343 (1958). In addition, Alaska enjoys similar rights under the equal footing doctrine. *See United States v. Alaska*, 521 U.S. 1, 6 (1997). While "the United States can prevent lands beneath navigable waters from passing to a State upon admission to the Union by reserving those lands in federal ownership" for "an appropriate public purpose," *id.* at 33–34; *see also* 43 U.S.C. § 1313(a) (excepting from the Submerged Lands Act "lands expressly retained by . . . the United States when the State entered the Union"), we have held that the Nation River was navigable at statehood and that Alaska took title to the riverbed at that time. *See Alaska v. United States*, 201 F.3d 1154, 1160, 1166 (9th Cir. 2000).

But lands submerged beneath inland waterways are distinct from the waterways themselves.[5] "Ownership [of

---

[5] Sturgeon, suggesting otherwise, quotes the Supreme Court's statement that "the Submerged Lands Act transferred 'title to and ownership of' the submerged lands *and waters*." *United States v. California*, 436 U.S. 32, 40 (1978) (emphasis added) (quoting 43 U.S.C. § 1311(a)). We do not understand the Supreme Court to have breezily adopted an interpretation of the Submerged Lands Act at odds with the statute's plain meaning. In contrast to ANILCA, which includes "waters" within the definition of "lands," the Submerged Lands Act distinguishes "lands" from the various "waters" lying above them. 43 U.S.C. § 1301(a). *California* involved a dispute over the right to

submerged lands] may not be necessary for federal regulation of navigable waters . . . ." *Alaska*, 521 U.S. at 42. Under the Submerged Lands Act, "[t]he United States retains all its navigational servitude and rights in and powers of regulation and control of [submerged] lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs." 43 U.S.C. § 1314(a).

We have held that the navigational servitude "is not 'public land' within the meaning of ANILCA" because "the United States does not hold title to the . . . servitude." *City of Angoon v. Hodel*, 803 F.2d 1016, 1027 n.6 (9th Cir. 1986) (per curiam) (citing *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 627–28 (1961)). We expanded that holding in *Alaska v. Babbitt* (*Katie John I*), deciding that Congress did not intend "to exercise its Commerce Clause powers over submerged lands and navigable Alaska waters" when it enacted ANILCA. 72 F.3d 698, 703 (9th Cir. 1995).

*Katie John I* analyzed the United States' interest in navigable waters in Alaska under the reserved water rights doctrine. Under this doctrine, when the federal government "withdraws its land from the public domain and reserves it for a federal purpose," the government impliedly "reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976). The United States thus "acquires a reserved right in unappropriated water

---

license kelp harvesting, *see* 436 U.S. at 35 n.8; neither "ownership of" nor rights to the waters was at issue. Presumably, the Court used "submerged lands and waters" to refer to submerged lands and water *resources*. *See* 43 U.S.C. § 1301(e) ("The term 'natural resources' includes . . . kelp . . . .").

which vests on the date of the reservation and is superior to the rights of future appropriators." *Id.*

Whether a federally reserved water right is implicit in a federal reservation of public land depends on whether the government intended to reserve unappropriated water. *Id.* at 139. "Intent is inferred if the previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created." *Id.*

In *Katie John I*, we concluded that "[t]he United States has reserved vast parcels of land in Alaska for federal purposes through a myriad of statutes," including ANILCA, and thereby has "implicitly reserved appurtenant waters, including appurtenant navigable waters, to the extent needed to accomplish the purposes of the reservations." 72 F.3d at 703 & n.10. This reservation of water rights gave the United States "interests in some navigable waters." *Id.* at 703. We held that ANILCA's "definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine." *Id.* In *John v. United States* (*Katie John II*), we decided without discussion that *Katie John I*'s holding "should not be disturbed or altered." 247 F.3d 1032, 1033 (9th Cir. 2001) (en banc) (per curiam).

In *Katie John III*, we considered regulations implementing Title VIII of ANILCA pertaining to subsistence management on public lands, 36 C.F.R. pt. 242. These regulations "included within the definition of 'public lands'"—and thus applied to—"all navigable and non-navigable water within the outer boundaries of . . . 34 listed land units," including Yukon-Charley. *Katie John III*, 720 F.3d at 1232; *see* 36 C.F.R. § 242.3(c)(28). As here, it was argued that State- and privately-owned lands located within a conservation system unit, referred to as

"inholdings," were not public lands and thus not subject to regulation. *Id.* at 1233.

We upheld the agency's inclusion of waters that lie on inholdings in the definition of public lands. *Id.* We reasoned that water rights impliedly acquired by the United States are not forfeited or conveyed to third parties along with the inholdings. *Id.* Because the water bodies were "actually situated within the boundaries of federal reservations," it was "reasonable to conclude that the United States ha[d] an interest in such waters for the primary purposes of the reservations." *Id.*

## B.

We are bound under our *Katie John* precedent to reach a similar conclusion here. To begin with, ANILCA's definition of "public lands" applies throughout the statute. It would be anomalous if we treated the regulation at issue in *Katie John III* regarding the geographic scope of regulations implementing Title VIII, 36 C.F.R. § 242.3, as employing a different construction of "public lands" than applicable elsewhere in ANILCA. The regulation does not define "public lands." By merely referencing the term,[6] which is defined globally in the statute, the regulation implies that there is but a single definition.

---

[6] The Title VIII regulations "apply on all public lands" within some conservation system units, *id.* § 242.3(b), but "exclud[e] marine waters" within others, *id.* § 242.3(c). Outside of the enumerated conservation system units, Title VIII regulations "apply on all other public lands, other than to the military, U.S. Coast Guard, and Federal Aviation Administration lands that are closed to access by the general public." *Id.* § 242.3(d).

While *Katie John III* involved ANILCA's rural subsistence priority, that was only one of the purposes for which ANILCA reserved lands as conservation system units. *Katie John III* recognized that "water rights may be essential to a purpose of the reservation other than subsistence." 720 F.3d at 1240.  Just as important was ANILCA's purpose of "provid[ing] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska."  16 U.S.C. § 3101(d).

Three years before the statute's enactment, President Carter withdrew and reserved the land for Yukon-Charley "for the protection of . . . historical, archeological, biological, [and] geological . . . phenomena" including habitat for "isolated wild populations of Dall sheep, moose, bear, wolf, and other large mammals."  Proclamation No. 4626, 43 Fed. Reg. 57,113 (Dec. 5, 1978).  In particular, he "reserved all water necessary to the proper care and management of those objects protected by [Yukon-Charley] and for [Yukon-Charley's] proper administration."  *Id.* at 57,114.  In that vein, Congress specified in section 201 of ANILCA that Yukon-Charley "shall be managed for the following purposes, among others":

> To maintain the environmental integrity of the entire Charley River basin, including streams, lakes and other natural features, *in its undeveloped natural condition* for public benefit and scientific study; to protect habitat for, and populations of, fish and wildlife, including but not limited to the peregrine falcons and other raptorial birds, caribou,

> moose, Dall sheep, grizzly bears, and wolves
> . . . .

16 U.S.C. § 410hh(10) (emphasis added).

Consistent with this intent, Congress has authorized the Secretary of the Interior to "prescribe regulations . . . concerning boating and other activities on or relating to water located within System units, including water subject to the jurisdiction of the United States." 54 U.S.C. § 100751(b). The Park Service's hovercraft ban, applicable to federally managed conservation areas nationwide, "was adopted pursuant to [§] 100751(b)." *Sturgeon*, 136 S. Ct. at 1067. To be more precise, the hovercraft ban was adopted pursuant to § 100751(b)'s statutory predecessor, which similarly provided the Secretary of the Interior with the authority to "[p]romulgate and enforce regulations concerning boating and other activities on or relating to waters located within areas of the National Park System, including waters subject to the jurisdiction of the United States." 16 U.S.C. § 1a-2(h) (1982).[7] This earlier version was enacted four years before ANILCA. Act to Amend the Administration of the National Park System, Pub. L. No. 94-458, 90 Stat. 1939 (1976). ANILCA specified that it did not in any way affect "any law governing appropriation or use of, or Federal right to, water on lands within the State of Alaska," and did not supersede, modify, or repeal "existing laws applicable to the various Federal agencies which are

---

[7] The hovercraft ban was implemented in 1983. *See* General Regulations for Areas Administered by the National Park Service, 48 Fed. Reg. 30,252, 30,258 (June 30, 1983). Section 100751(b) took effect in 2014 when Congress added Title 54 to consolidate "provisions relating to the National Park Service and related programs" in "one distinct place." H.R. Rep. No. 113-44, at 2 (2013).

authorized to develop or participate in the development of water resources or to exercise licensing or regulatory functions in relation thereto." 16 U.S.C. § 3207(1), (3).

The hovercraft ban is also consistent with Congressional intent. Hovercraft were prohibited "because they provide virtually unlimited access to park areas and introduce a mechanical mode of transportation into locations where the intrusion of motorized equipment by sight or sound is generally inappropriate." General Regulations for Areas Administered by the National Park Service, 48 Fed. Reg. 30,252, 30,258 (June 30, 1983). The hovercraft ban thus serves the purpose of keeping waterways in their "undeveloped natural condition . . . to protect [wildlife] habitat." 16 U.S.C. § 410hh(10).

## C.

Sturgeon argues that "[r]eserved water rights are not a 'title' interest." While that is true in a narrow, technical sense, *see Fed. Power Comm'n v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 247 n.10 (1954) ("Neither sovereign nor subject can acquire anything more than a mere usufructuary right [in the water itself] . . . ."), by the same logic the State also lacks a "title" interest in the waters above its riverbeds. Water cannot be owned, *see, e.g.*, 2 Amy K. Kelley, *Waters and Water Rights* § 36.02 (3d ed. 2017) (observing the Supreme Court's impatience "with claims of absolute 'ownership' by *either* [state or federal] government"), but "the right of [water's] use, as it flows along in a body, may become a property right." *Niagara Mohawk Power Corp.*, 347 U.S. at 247 n.10.

The word "title" has many meanings. Equitable title, for example, is a beneficial interest in property. *See, e.g.*, *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1067 n.6 (9th Cir.

1997) (using the phrases "vested interest" and "equitable title" interchangeably).  Thus, "title" to an "interest" in water almost certainly means a vested interest in the water, such as a reserved water right.  But even if we were uncertain, *Katie John I* already decided the matter when it held that ANILCA's "definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine."  72 F.3d at 704.  That could not be so unless title to an interest in Alaska's navigable waters is in the United States.  *See* 16 U.S.C. § 3102(1)–(3).

Sturgeon also argues that "[t]he reserved water rights doctrine is premised on the need for actual use and withdrawal of water" and that the Park Service has shown no need for a specific quantity of water because the water in conservation system units is not scarce.  *Katie John III* forecloses that argument.   There was similarly "no suggestion that any federal reservation along any Alaskan waters risks being turned into a 'barren waste' . . . , or a substantially diminished pool . . . , or is in any way short of water."  720 F.3d at 1238.  For that reason, in determining the geographic scope of the United States' reserved water rights, *Katie John III* "include[d] . . . all the bodies of water on which the United States' reserved rights *could at some point* be enforced—*i.e.*, those waters that are or *may become necessary* to fulfill the primary purposes of the federal reservation at issue."  *Id.* at 1231 (emphasis added).  Here, one of the reservation's primary purposes is to protect fish.  The diminution of water in any of the navigable waters within Yukon-Charley's boundaries would necessarily impact this purpose, giving rise to a reserved water right.

Sturgeon points out that some 18 million acres within ANILCA-established       conservation       system       units,

approximately one-sixth of the total, are land selections for Native Corporations.  He worries that federal regulation of navigable waters within the units will result in "economic catastrophe" to native shareholders by "impeding any efforts . . . to productively utilize their lands."  Even if true, that is not at issue in this case.  Sturgeon lacks standing to assert hypothetical claims on the Native Corporations' behalf.  In any event, "Congress clearly did not state in ANILCA that subsistence uses are always more important than . . . other uses of federal lands; rather, it expressly declared that preservation of subsistence resources is *a* public interest and established a framework for reconciliation, where possible, of competing public interests." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545–46 (1987).  Should Sturgeon's concerns materialize, they can be resolved in an appropriate case.

## IV.

ANILCA section 103(c) does not limit the Park Service from applying the hovercraft ban on the Nation River in Yukon-Charley because, under our *Katie John* precedent, the United States has an implied reservation of water rights, rendering the river public lands.  Therefore, the district court's order granting summary judgment to defendants is

**AFFIRMED.**

NGUYEN, Circuit Judge, with whom Circuit Judge NELSON joins, concurring:

We are bound by our *Katie John* decisions to analyze this case under the reserved water doctrine.  That is unfortunate. A reserved water right is the right to a sufficient *volume* of

water for use in an appropriate federal purpose. *See John v. United States* (*Katie John III*), 720 F.3d 1214, 1226 (9th Cir. 2013) ("[A]pplications of the federal reserved water rights doctrine have focused on the amount of water needed for a specific federal reservation, rather than the locations of water sources that might generally be needed . . . ."). This case has nothing to do with that. Rather, it is about the right to regulate navigation on navigable waters within an Alaska national preserve. That is a Commerce Clause interest and should be analyzed as such.

*Alaska v. Babbitt* (*Katie John I*), 72 F.3d 698 (9th Cir. 1995), expressed two concerns with analyzing regulatory issues under the navigational servitude or, more generally, the Commerce Clause. One concern was that by treating the federal government's power to regulate under the Commerce Clause as an interest in water, we render ANILCA's definition of Federal lands meaningless because the United States cannot have "title to" such an interest. 72 F.3d at 704. But that is no less true of the United States' ability to have "title to" a reserved water right. *See John v. United States* (*Katie John II*), 247 F.3d 1032, 1047 (9th Cir. 2001) (Kozinski, J., dissenting) ("[A] usufructuary right does not give the United States *title* to the waters or the lands beneath those waters."). And treating either interest—a navigational servitude or a reserved water right—as a property interest to which the United States holds title is a reasonable interpretation of the statute. The Supreme Court has referred to navigable waters as "the public property of the nation" insofar as "[t]he power to regulate commerce comprehends [federal] control for that purpose, and to the extent necessary." *United States v. Rands*, 389 U.S. 121, 123 (1967) (quoting *Gilman v. City of Philadelphia*, 70 U.S. 713, 724–25 (1865)).

*Katie John I*'s textual concern misses a larger point: even if the federal interest in navigable waters under the Commerce Clause is not a property right at all, it is a power "paramount to . . . proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources [of] the respective States." 43 U.S.C. § 1314(a); *see also New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 338 n.6 (1982) ("Whatever the extent of the State's proprietary interest in the river, the pre-eminent authority to regulate . . . resides with the Federal Government."). The proper exercise of the Commerce Clause power is "not an invasion of any private property rights in the stream or the lands underlying it." *United States v. Cherokee Nation of Okla.*, 480 U.S. 700, 708 (1987) (quoting *Rands*, 389 U.S. at 123). Thus, whether the navigational servitude is "public land" or not is irrelevant. ANILCA expressly left in place federal jurisdiction to regulate the navigable waters. *See* 16 U.S.C. § 3207 ("Nothing in this Act shall be construed as limiting or restricting the power and authority of the United States or . . . as expanding or diminishing Federal or State jurisdiction, responsibility, interests, or rights in water resources development or control . . . .").

*Katie John I*'s other concern was that reliance on the Commerce Clause would allow "a complete assertion of federal control" over "all [navigable] waters in Alaska." 72 F.3d at 704. But the United States' power to regulate activity within the sphere of federal interests on navigable waters is not an exclusive right. States may regulate their waterways to the extent their regulations do not conflict with federal ones. *See Barber v. Hawai'i*, 42 F.3d 1185, 1191 (9th Cir. 1994) ("The purpose of [the Submerged Lands Act] was not for the Federal Government to retain exclusive jurisdiction over navigation of the waters above the

submerged lands, but for the Federal Government to retain concurrent jurisdiction over those waters."); *see also Courtney v. Goltz*, 736 F.3d 1152, 1160 (9th Cir. 2013) (holding that states may regulate business franchises on navigable waters so long as they do not "encroach on the federal commerce power").

Although *Katie John I* purported to eschew the Commerce Clause as a source of federal regulatory power, it conceded that the reserved water rights doctrine originates in part in the Commerce Clause. 72 F.3d at 703 (citing *Cappaert v. United States*, 426 U.S. 128, 138 (1976)). In fact, the doctrine arises solely from the Commerce Clause insofar as Alaska's navigable waters are concerned. The doctrine's other source, the Property Clause, merely "permits federal regulation of federal lands." *Cappaert*, 426 U.S. at 138 (citing U.S. Const. art. IV, § 3). Alaska's navigable waters are not federal lands in the usual (non-ANILCA) sense because the riverbeds by default now belong to Alaska. It is the Commerce Clause that "permits federal regulation of navigable streams" regardless of who owns the land beneath. *Id.* (citing U.S. Const. art. I, § 8).

*Katie John I* described its own holding as "inherently unsatisfactory." 72 F.3d at 704. We have since criticized it as a "problematic solution to a complex problem, in that it sanctioned the use of a doctrine ill-fitted to determining which Alaskan waters are 'public lands.'" *Katie John III*, 720 F.3d at 1245. I could not agree more.

I would adopt the well-reasoned approach set forth in Judge Tallman's concurrence to *Katie John II*. Rather than continuing to shove a square peg into a hole we acknowledge is round, we should embrace a Commerce Clause rationale for federal regulation of Alaska's navigable waters.